Opinion issued June 10, 2004



 
     





In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00175-CV




DAVID MOLINA, FILIBERTO FUENTES, AND SPECIALIZED
COMPONENTS, INC., Appellants

V.

AIR STARTER COMPONENTS, INC., Appellee




On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 02-CV-126607


 

MEMORANDUM OPINION

          This is an accelerated, interlocutory appeal


 from the grant of a temporary
injunction against appellants, David Molina, Filberto Fuentes, and Specialized
Components, Inc. (collectively, Specialized), in favor of appellee, Air Starter
Components, Inc. (Air Starter). After conducting a two-day evidentiary hearing, the
trial court entered findings of fact and ordered temporary injunctive relief.


 The
temporary injunction prohibits Specialized from the following activities:
1.Specialized shall not contact, disclose the name of, or
communicate information about, eight customers identified on a
customer list provided to the trial court by Air Starter and
submitted to that court and this court under seal, and 
 
2.Specialized shall not manufacture any of the items in, or depicted
in the plans which were delivered in, the box delivered to Molina,
of four specifically named products that Air Starter manufactures.
In four issues, Specialized contends that the trial court abused its discretion by
granting a temporary injunction because Air Starter did not establish (1) a probable
right to recover on its cause of action, (2) a probable, imminent, and irreparable injury
in the interim, (2) that Specialized wrongfully used and would continue to use any
confidential information of Air Starter’s, and (4) that the identities of the eight
customers protected by the injunction are either trade secrets or confidential
information subject to misappropriation. We affirm. 
Procedural BackgroundAir Starter’s verified pleadings against Specialized alleged that Molina and
Fuentes copied and removed Air Starter’s confidential information. The pleadings
included a request for temporary and permanent injunctive relief. Air Starter’s
underlying claims, which await trial on the merits, include the following:
misappropriation of trade secrets; conversion; violations of the Theft Liability Act


;
breach of contract; unjust enrichment and disgorgement; unfair competition; and
tortious interference with existing and prospective business relations. 
Factual Background


 
          Air Starter is competitively ranked first in the business of manufacturing and
marketing to distributors air starters and aftermarket parts developed through a
“reverse-engineering” process. After two Air Starter employees, Molina and Fuentes,
left employment with Air Starter, they went to work for Specialized, a recent
competitor of Air Starter. While at Air Starter, both Molina and Fuentes were among
employees who had access to information that the company considered its trade
secrets. 
Information in the Box
          In March 2001, after six years’ employment and over three years as machine-shop manager at Air Starter, Molina began employment at Specialized as its
production manager. While at Air Starter, Molina alone had maintained the files that
contained the drawings and production information for each product that Air Starter
manufactured. Molina kept these documents in a filing cabinet in the machine shop. 
Shortly after Molina left Air Starter, Air Starter discovered that many of the files in
the machine-shop filing cabinet were empty. Possessing the drawings contained in
the files could save two or more weeks in the production of the products. 
          In April 2001, one month after Molina left Air Starter, its general manager
recovered from Specialized a sealed box that was located in Molina’s office at
Specialized. The box had been taken from Air Starter’s premises the previous day by
an Air Starter employee who claimed that he had taken the box to Molina at Molina’s
request. The box contained the raw castings of one rotor, a “completely machined”
rotor, and a pinion gear, as well as drawings for two rotors and for a part of a starter. 
Having the drawings would reduce to less than a day the customarily lengthy reverse-engineering process, which can take from a few weeks to months. Although the
employee who had taken the box claimed that Molina had requested scrap pieces
from the Air Starter machine shop to make barbecue pit handles, Molina told Air
Starter’s general manager that he needed the drawings in the box to help somebody
who was manufacturing the “800” rotor with the specifications. Two months after
the employee brought the box to Molina, Specialized began producing parts
corresponding to the drawings in the box. Before Molina went to work for
Specialized, Specialized had not been a competitor of Air Starter. After Molina’s
employment with Specialized, all of their products began to compete with the
products that Air Starter makes.
Customer Information
           Air Starter had invested thousands of hours over many years developing its list
of 800 to 1,000 customers. Air Starter relied on many sources, including trade shows
and trade publications. Air Starter sells to distributors and took security precautions
to protect its customer list and the pricing and discount information for its customers. 
Air Starter stored data pertaining to its customers on password-protected computer
files and on a backup rolodex. The computer and rolodex were kept in a room that
was locked after business hours and to which only Air Starter staff had access, and
the company’s building was locked and secured at night. Accounting files, including
information relating to three levels of customer discounts, as well as blueprints,
drawings, and metal-mix specifications for parts the company manufactured, were
also kept on the company computer in password-protected files. 
          Fuentes left Air Starter in June 2002 and began working for Specialized three
months later. Fuentes had worked for Air Starter for 10years, with five years in sales,
and held the sales-manager position when he left. While working at Air Starter,
Fuentes developed and expanded the company’s existing client base. Six months
before leaving Air Starter, Fuentes signed a nondisclosure agreement in favor of Air
Starter. The agreement specified that customer names and addresses and price lists
were Air Starter’s “sole confidential property.” 
          When Fuentes joined Specialized, he worked with an owner of the company
to assemble a prospective customer list. After Fuentes joined Specialized, its
customers grew from three to about 20 in a two-month period. One customer went
from doing $72,000 worth of business with Air Starter in 2001 to no business at all
after Fuentes joined Specialized. At least one of Specialized’s new customers does
not advertise. Many others cannot be found by internet or telephone-directory
searching. Air Starter’s owner said that there was no way that someone could
independently put together a prospective customer list in the time that Fuentes had
been at Specialized. Specialized’s product prices are either equal to or slightly below
Air Starter’s prices, which are not generally known to the public. Standard of Review
           Whether to grant or deny a temporary injunction is a decision committed to the
sound discretion of the trial court and will be reversed only for a clear abuse of that
discretion. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002). A
temporary injunction’s purpose is to preserve the status quo of the subject matter of
the underlying litigation pending trial on the merits. Id. 
          A temporary injunction is an extraordinary remedy that does not issue unless
the party seeking relief pleads and proves three specific elements: (1) a cause of
action, (2) a probable right to recover on that cause of action, and (3) a probable,
imminent, and irreparable injury in the interim. Id. An injury is irreparable if the
party seeking the writ cannot be adequately compensated in damages or if the
damages cannot be measured by any certain pecuniary standard. Id. Because the
party seeking the writ need not prove that it will ultimately prevail, the merits of the
underlying case are not before us. See T-N-T Motorsports, Inc. v. Hennessey
Motorsports, 965 S.W.2d 18, 21-22 (Tex. App.—Houston [1st Dist.] 1998, no pet.);
Miller Paper Co. v. Roberts Paper Co., 901 S.W.2d 593, 597 (Tex. App.—Amarillo
1995, no writ). 
          In determining whether the trial court abused its discretion, we may not
substitute our judgment for that of the trial court unless its decision was so arbitrary
that it exceeded the bounds of reasonableness. See Butnaru, 84 S.W.3d at 204; T-N-T
Motorsports, 965 S.W.2d at 21. Accordingly, we review the evidence submitted to
the trial court in the light most favorable to that court’s ruling, draw all legitimate
inferences from the evidence, and defer to the trial court’s resolution of conflicting
evidence. See Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 1978); CRC-Evans
Pipeline, Int’l, Inc. v. Myers, 927 S.W.2d 259, 262 (Tex. App.—Houston [1st Dist.]
1996, no writ).
Use of Trade Secrets
          Specialized contends in its fourth issue that the items in the box and the client
information were not trade secrets or confidential information belonging to Air
Starter. In its third issue, Specialized contends that there is no evidence that it used
or would continue to use confidential information that belonged to Air Starter. We
address these issues together.  
          A trade secret is “any formula, pattern, device or compilation of information
which is used in one's business, and which gives one an opportunity to obtain an
advantage over competitors who do not know or use it.” T-N-T Motorsports, 965
S.W.2d at 22. “Secret” implies that the information is not generally known or readily
available. Id. Customer lists, pricing information, client information, customer
preferences, buyer contacts, blueprints, market strategies, and drawings have all been
recognized as trade secrets. Id. To determine whether information constitutes a trade
secret, a court should apply the following six factors:
(1)the extent to which the information is known outside the
claimant’s business; 
 
(2)the extent to which the information is known by employees and
others involved in the claimant’s business; 
 
(3)the extent of the measures taken by the claimant to guard the
secrecy of the information; 
 
(4)the value of the information to the claimant and to its competitors; 
 
(5)the amount of effort or money expended by the claimant in
developing the information; and 
 
(6)the ease or difficulty with which the information could be
properly acquired or duplicated by others. 

In re Bass, 113 S.W.3d 735, 739 (Tex. 2003). The party claiming a trade secret need
not satisfy all six factors because trade secrets do not fit neatly into each factor every
time. Id. at 740. Moreover, the factors are not exhaustive because other
circumstances could also be relevant to the trade-secret analysis. Id. 
Information in the Box
          In its findings of fact concerning the items in the box, the trial court recited that
they were trade secrets belonging to Air Starter. Viewing the record in the light that
supports the trial court’s ruling to determine if any evidence supports that finding, the
record shows that the items in the box that are protected by the temporary injunction
appear to be very valuable to Air Starter and Specialized for the following reasons. 
First, one month after he left Air Starter, Molina sent someone to Air Starter to
acquire the contents of the box. Second, Molina conceded that he needed the
drawings in the box to learn the specifications for the manufacture of the 800 rotor. 
Third, the drawings in the box could reduce the production time for the items in the
box from weeks or months to less than a day. Fourth, Specialized started producing
parts corresponding to the drawings in the box two months after having access to it. 
          The remaining Bass factors also support the trial court’s finding to a degree
that sufficiently warranted issuing the temporary injunction. Viewed in the light most
favorable to the trial court’s ruling, the record shows that Air Starter’s success in the
air-starter market derived in significant part from its prolonged efforts over time, as
well as its expertise in developing, competitively pricing, and marketing air starters. 
None of these were matters of general knowledge outside Air Starter’s business. As
machine-shop manager, Molina was entrusted with information not known to other
Air Starter employees, to the extent that he had exclusive access to the files in the
machine-shop filing cabinet. Air Starter took security precautions to ensure that other
employees did not have that information. Having considered the circumstances of
this case, and weighed them in the light most favorable to the trial court’s ruling and
in the context of the Bass factors, we conclude that the contents of the box were trade
secrets belonging to Air Starter. 
          Specialized’s arguments on appeal do not challenge that the items in the box
were Air Starter’s trade secrets. Instead, Specialized contends here, as it does in all
of its issues on appeal, that there is no evidence that Molina asked anyone to take the
contents of the box from Air Starter, or that anyone at Specialized opened the box,
used the contents in the box, or even saw the contents in the box. Specialized’s
assertion that no evidence showed that Molina asked anyone to bring him the box
ignores the testimony of Jack Heck, the owner of Air Starter, who claimed that
Molina admitted that he wanted the drawings in the box. Although no direct evidence
shows that anyone at Specialized opened the box, used the contents in the box, or
even saw the contents in the box, the inferences to be drawn from the evidence
concerning the circumstances surrounding how the box was taken and Molina’s
statements about the drawings, when viewed in support of the trial court’s ruling,
rationally support the trial court’s conclusion that Molina had someone take the
contents in the box from Air Starter so that he could reproduce Air Starter’s product.
Specialized’s arguments ignore that we must review the evidence submitted to the
trial court in the light that supports its ruling, unless it is so arbitrary that it exceeds
the bounds of reasonableness. See Butnaru, 84 S.W.3d at 204; T-N-T Motorsports,
965 S.W.2d at 21. Specialized has not shown that the trial court’s decision falls into
that latter category, and the record does not compel that conclusion. 
          In each of its issues on appeal, Specialized also asserts that there is no evidence
that it is manufacturing air starter parts in competition with Air Starter as a result of
Molina’s disclosing or converting any Air Starter confidential information or trade
secrets, and that the trial court impermissibly piled inference on inference to reach its
conclusion. Specialized’s contentions effectively demand direct evidence, but
Specialized has not referred us to any authority that requires direct evidence in order
that a temporary injunction may issue, and we are aware of none. Viewed in the light
supporting the trial court’s ruling, the record shows the following circumstantial
evidence: First, one month after Molina left Air Starter to work for Specialized as its
production manager, Molina had instructed an Air Starter employee to bring him a
box containing Air Starter’s confidential, trade-secret property. Second, the property
consisted of drawings and specifications for Air Starter products. Third, Molina
admitted that he wanted the contents in the box to obtain the specifications of one of
the products. Fourth, the contents in the box would help reduce the time involved in
the reverse-engineering process from weeks or months to less than a day. Fifth, two
months after the box was found at Specialized’s premises, Specialized started
producing parts corresponding to the drawings in the box. Viewed in the light
supporting the trial court’s ruling, the circumstantial evidence in the record
sufficiently supports the trial court’s finding that Specialized had wrongfully used and
would continue to use Air Starter’s trade secrets contained in the box. 
          In each of its issues on appeal, Specialized further asserts that Molina was not
required to keep any information confidential and was not subject to a nondisclosure
agreement when he worked for Air Starter. Because the box of items was not taken
when Molina was employed with Air Starter, the confidentiality terms of his
employment with Air Starter are not at issue here. Additionally, because the
temporary injunction does not pertain to the information that may have been taken
from Air Starter’s filing cabinets, we decline to address Specialized’s complaints that
the evidence is insufficient to show that Molina took the files. 
          We conclude that the record sufficiently supports the trial court’s finding that
Specialized had wrongfully used and would continue to use Air Starter’s trade secrets
contained in the box. We overrule Specialized’s third and fourth issues concerning
the items in the box.
Customer Information
          The findings of fact reflected in the trial court’s order granting temporary relief
recite that Fuentes disclosed Air Starter’s confidential information and trade secrets
to Specialized. Applying the Bass factors and viewing the record in support of the
trial court’s ruling, we conclude that the evidence adequately demonstrates that Air
Starter considered the customer lists, pricing information and buyer contacts its trade
secrets, and that Air Starter took security precautions to protect the confidentiality of
that information. 
          Air Starter expended considerable effort and time to develop its client base,
which consisted of both names and product information. Air Starter instructed its
employees that the client information was confidential and entered into a
nondisclosure agreement with Fuentes. This agreement specified that customer
names, addresses and price lists were Air Starter’s “sole confidential property.” The
client information was valuable to Specialized because it enabled Specialized to
increase its customers from three to about 20 in the two-month period after Fuentes
joined Specialized. The client information was also valuable to Air Starter, as
evidenced by its loss of $72,000 worth of business from one company after Fuentes
joined Specialized. The client information at issue is difficult to acquire and
duplicate because some of the customers do not advertise, and many cannot be found
through internet or telephone-book searches. Moreover, Air Starter’s pricing and
discount information was available only to Air Starter and its customers and is not
generally known to the public. After viewing the record in the light favorable to the
trial court’s ruling and the Bass factors, we conclude that the record adequately
supports the court’s finding that the client information was a trade secret that
belonged to Air Starter.  
          In its four issues on appeal, Specialized makes the following arguments: (1) Air
Starter’s client information was on a rolodex and computer that was accessible to
many, and thus, neither secret nor confidential; (2) Fuentes and the other Air Starter
employees were not told to keep the customer information confidential; and (3)
because Fuentes learned the client information before the existence of the
nondisclosure agreement, the agreement was irrelevant. We defer to the trial court’s
assessments concerning the weight and credibility of the evidence concerning
whether others had access to the rolodex and computer and whether employees were
told to keep the client information confidential. Moreover, the terms of the
nondisclosure agreement that Fuentes signed provided that he was to keep
confidential “all data . . . relating to past, present or prospective customers . . . or any
other confidential information relating to or learned . . . by [Fuentes] while in the
employ of [Air Starter] . . . .” Accordingly, the trial court properly exercised its
discretion by concluding that the nondisclosure agreement included information that
Fuentes acquired while at Air Starter, but before he signed the nondisclosure
agreement. 
          In each of its four issues, Specialized makes the following additional
contentions. First, there is no evidence that Fuentes gave any client information to
Specialized or that Specialized contacted any of the clients encompassed by the
temporary injunction order. Second, there is no evidence that Air Starter did business
with any company listed in the temporary injunction order. Third, Air Starter did not
formally exist for 30 years and could not have developed its customers during that
time period. Fourth, Specialized developed its own clients independently and based
on contacts initiated by the clients. We construe Specialized’s arguments as
effectively demanding direct evidence that Specialized initiated contacts with Air
Starter’s customers that resulted in new business for Specialized. These contentions
ignore the circumstantial evidence showing that, after Molina and Fuentes began
working for Specialized, its product line expanded and its customers rapidly
increased, to the extent that one of Air Starter’s customers cut off all business with
Air Starter. Specialized cited no authority to the trial court that required direct
evidence and has not referred this Court to any authority that requires that evidentiary
showing before a temporary injunction to issue, and we are aware of none. 
          We overrule Specialized’s third and fourth issues. 
Probable Right to Relief and Probable, Imminent Injury
          In its first issue, Specialized contends that Air Starter failed to establish a
probable right to the relief sought. A party seeking injunctive relief shows a probable
right of success on the merits by alleging a cause of action and presenting evidence
that tends to sustain it. T-N-T Motorsports, 965 S.W.2d at 23-24. In its second issue,
Specialized asserts that the trial court abused its discretion by granting the temporary
injunction because Air Starter did not establish either a probable, imminent injury in
the interim or that it did not have an adequate remedy at law. Probable injury
includes elements of imminent harm, irreparable injury and no adequate remedy at
law for damages. T-N-T Motorsports, 965 S.W.2d at 24. 
Information in the Box
          The trial court made the following findings of fact in support of its ruling: 
1.A probability exists that [Air Starter] will prevail upon trial of the
merits, and
. . . .
 
6.The contents of the box delivered to [Molina] contained
confidential information and trade secrets of [Air Starter] relating
to specific items that [Air Starter] manufactures and sells, and
          . . . .
 
9. If a temporary injunction is not issued prohibiting [Specialized
and specifically named others in association with Specialized]
from manufacturing any of the items in, or depicted in the plans
in, the box delivered to [Molina], specifically described as [parts
for two 800 series air starters and two 150 series air starters], then
[Air Starter] will suffer the loss of sales of those items[,] the
extent and value of which cannot be readily determined and
compensated. 
  
In challenging the trial court’s findings concerning the contents of the box, however,
Specialized reiterates its challenges to Air Starter’s proof concerning independent
development of its products, and we reject the arguments for the same reasons
addressed above. Additionally, for the same reasons discussed above, we conclude
that the evidence tends to sustain Air Starter’s contention that Specialized took the
box that contained the trade secrets and used that information to develop its products
to compete against Air Starter. We conclude that Air Starter established, sufficiently
to warrant issuance of a temporary injunction, a probable right to the relief sought. 
We overrule Specialized’s first issue concerning the injunction for the items in the
box.            
          Specialized generally contends that Air Starter’s alleged injuries are
speculative and conjectural, but makes no specific complaints about the evidence
concerning the items in the box. As discussed before, on viewing the evidence in the
light that most favors the trial court’s ruling, we conclude that it is sufficient to
warrant the temporary injunction issued. We overrule Specialized’s second issue
concerning the injunction for the items in the box. 
Client Information
          The temporary injunction for the client information was based on Air Starter’s
allegation that Fuentes gave Specialized the names of and pertinent information for
eight Air Starter clients. While employed at Air Starter, Fuentes signed a
nondisclosure agreement in which he stated that he agreed, during his employment
with Air Starter and “at all times thereafter,” as follows:
[Fuentes] will not use for his personal benefit, or disclose, communicate
or divulge to, or use for the direct or indirect benefit of any person, firm,
association or company . . . any material referred to in the [agreement]
or any confidential information regarding the business methods . . .
techniques, research or development projects or results, trade secrets, or
other knowledge or processes of or developed by [Air Starter] or any
names and addresses of customers, clients, suppliers or dealers, or any
data . . . relating to past, present or prospective customers . . . or any
other confidential information relating to or learned . . . by [Fuentes]
while in the employ of [Air Starter] . . . . [Fuentes] therefore
acknowledges that, in the event of the [his] violation of any of these
restrictions, [Air Starter] will be entitled to . . . preliminary and
permanent injunctive relief. 

The agreement specified that customer names and addresses and price lists were Air
Starter’s “sole confidential property.” 
          The trial court’s order granting temporary relief includes the following findings
that pertain to this agreement:
1.A probability exists that [Air Starter] will prevail upon trial of the
merits, and
 
2.The agreement entered into by [Fuentes and Air Starter] is
enforceable and is specific as to all customers and customer lists
and that [sic] it sets out a specific period of time, and
 
3.The agreement entered into by [Fuentes and Air Starter] provided
that [Fuentes] agreed not to use for his personal benefit or
disclose, communicate or divulge to, or use for the direct or
indirect benefit of any person, firm association or company other
that [sic] [Air Starter] any confidential information or trade
secrets of [Air Starter], and
 
4.The agreement entered into by [Fuentes and Air Starter] provides
that in the event of a breach of its terms by [Fuentes] that [Air
Starter] will be entitled to injunctive relief, and 
 
5.That [Fuentes] has disclosed confidential customer information
and trade secrets to [Specialized], and
          . . . .
 
7.If a temporary injunction is not issued which enjoins [Specialized
and specifically named others in association with Specialized]
from contacting or disclosing the name of, or communicating
information about any person or entity who was a customer of
[Air Starter] prior to June 30, 2002, for the personal benefit of
[Specialized and specifically named others in association with
Specialized] then: [Air Starter] will suffer the loss of sales the
extent of which cannot be ascertained with any reasonable
certainty, and [Air Starter’s] business relationship with those
customers that are contacted by [Specialized] will be impaired to
an extent and for a period of time which cannot be determined or
repaired, and
 
8.The lists of customers attached [to the court’s order] under seal
are a true and correct copy of the customers known by [Air
Starter] to have been contacted by [Specialized]
          . . . . 

Fuentes does not dispute here and did not dispute in the trial court that (1) he entered
into the nondisclosure agreement, (2) the agreement stated that the customer names,
addresses, and price information were the sole confidential property of Air Starter,
(3) the agreement covered the past, present and future client information known by
Fuentes, and (4) the agreement provided for temporary injunctive relief if customer
names, addresses, or price lists were revealed by him. Accordingly, the nondisclosure
agreement alone supports the temporary injunction’s prohibiting Fuentes, as a
Specialized employee, from using the customer-contact information specified by the
trial court. 
          The client information that Specialized acquired and on which Air Starter
based its request for temporary relief came only from Fuentes, who had agreed in the
nondisclosure agreement to keep that information confidential. Specialized
nevertheless repeats its sufficiency challenges by contending that no evidence shows
that Fuentes took any or used any confidential information or trade secrets from Air
Starter and that Specialized made its customer contacts independently. We reject
Specialized’s assertion that the evidence is insufficient to warrant the issuance of the
temporary injunction for the same reasons addressed above and again defer to the trial
court’s resolution of the weight and credibility of the evidence and the inferences to
be drawn from the evidence. We overrule Specialized’s first issue concerning the
client information. 
          Specialized also contends that Air Starter’s alleged injuries are speculative and
conjectural because Air Starter’s owner stated only that its market was damaged as
a result of customers’ being contacted and that its sales should have increased more
than they had. Specialized further asserts that Air Starter lost only one customer, at
$5,000 a month in lost sales, but that this was not due to Specialized’s conduct, and
that those damages are nevertheless calculable. We reject Specialized’s assertion that
the evidence is insufficient to warrant the issuance of the temporary injunction, for
the same reasons discussed before, and defer again to the trial court’s resolution of
the weight and credibility of the evidence and the inferences to be drawn from the
evidence. We overrule Specialized’s second issue concerning the client information. 
                                                         Conclusion
          We affirm the temporary writ of injunction issued by the trial court. 
 
 
                                                             Elsa Alcala
                                                             Justice

Panel consists of Chief Justice Radack and Justices Alcala and Bland.