COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-297-CV
  
  
FRANK E. SANDS                                                                  APPELLANT
  
V.
  
THE ESTATE OF                                                                       APPELLEE
JAMES CRAIG BUYS,
DECEASED
 
  
------------
 
FROM PROBATE COURT NO. 2 OF 
TARRANT COUNTY
 
------------
 
OPINION
 
------------
I. Introduction
        In 
this accelerated appeal, Frank E. Sands appeals the trial court’s issuance of 
a temporary injunction for the Estate of James Craig Buys, Deceased. In four 
issues, Sands complains that the trial court abused its discretion by granting 
the temporary injunction, the injunction is fatally defective in form and 
content, the Estate’s unclean hands preclude it from obtaining injunctive 
relief, and the temporary injunction is an unreasonable restraint of trade. We 
will reverse and render.
II. Background Facts and Procedural History
        Sands 
is a certified public accountant who has practiced public accountancy in Plano, 
Texas for well over twenty years. In February 2000, Sands sold his accounting 
practice to James C. Buys & Associates, P.C. (the Corporation). The purchase 
agreement between Sands and the Corporation contained a covenant not to compete. 
Immediately following the purchase of Sands’s practice, Buys moved the clients 
the Corporation had obtained from Sands from Plano to the Corporation’s 
Colleyville, Texas office. The Corporation also acquired two other accounting 
practices in Plano. In 2001, the Corporation retained Sands as an independent 
contractor to work on special projects assigned by Buys. At that time, none of 
Sands’s former clients were being serviced out of the Corporation’s Plano 
office. Instead, virtually all the clients in the Plano office had been obtained 
through the Corporation’s other acquisitions.
        In 
February 2002, Sands became a full-time employee of the Corporation, serving as 
manager of the Plano office. Thereafter, about twenty of Sands’s former 
clients who had been transferred to the Colleyville office asked to be 
transferred back to the Plano office so that Sands could provide them accounting 
services. Sands also actively marketed his services and generated more than 
twenty-five additional clients for the Corporation.
        While 
Sands was manager of the Plano office, the Corporation had several other 
employees and three independent contractors. The independent contractors were 
practicing accountants who did not work exclusively for the Corporation.
        Buys 
died in June 2004. Following Buys’s death, Sands continued to serve as manager 
of the Corporation’s Plano office at the request of the Estate’s attorney. 
In addition, the Estate hired a business broker to negotiate the sale of the 
Corporation’s assets. Sands made an offer of $50,000, which the broker 
believed was considerably less than the Plano office was worth. Sands also 
notified Carol Buys-Michela, Buys’s widow, by letter of his intent to open up 
his own office regardless of whether the Estate accepted his purchase offer. On 
August 17, Sands tendered his resignation from the Corporation effective August 
31, 2004.
        Meanwhile, 
unbeknownst to Sands, the Estate negotiated with other CPAs to sell the assets 
of the Plano office. One prospective purchaser was David Harvey, a CPA 
practicing in Richardson, Texas. The Estate also obtained an ex parte temporary 
restraining order ordering Sands’s removal from the Plano office so that he 
could not access, use, or disclose any of the Corporation’s trade secrets or 
confidential or proprietary information.
        On 
August 20, 2004, Sands was removed from the Plano office pursuant to the 
temporary restraining order. Sands took nothing with him except his personal 
time log. On August 23, 2004, the Estate sent letters to all the Plano 
office’s clients advising them that Harvey was assuming the Corporation’s 
practice and that all future inquiries should be made to him at his Richardson 
office.
        The 
Estate then sued Sands for misappropriation of the Corporation‘s trade secrets 
and confidential information and for breach of the covenant not to compete 
contained in the February 2000 purchase agreement between Sands and the 
Corporation. The Estate sought temporary and permanent injunctive relief. After 
a hearing, the trial court ruled that the covenant not to compete was 
unreasonable as a matter of law and refused to grant injunctive relief on that 
basis.[1]  Based on the Estate’s 
misappropriation of trade secrets claim, however, the trial court entered a 
temporary injunction prohibiting Sands from “contacting, soliciting or 
accepting any business” from the Corporation’s clients with whom Sands had 
had any contact or for whom he had performed services during the time he worked 
for the Corporation as either an employee or an independent contractor. This 
appeal followed.
III. Applicable Law
        In 
his first issue, Sands contends that the trial court abused its discretion by 
entering the temporary injunction because, among other things, the Estate failed 
to establish a probable right to recovery on its misappropriation of trade 
secrets claim.
        The 
purpose of a temporary injunction is to preserve the status quo of the 
litigation's subject matter pending a trial on the merits. Butnaru v. Ford 
Motor Co., 84 S.W.3d 198, 204 (Tex. 2002). A temporary injunction is an 
extraordinary remedy and does not issue as a matter of right. Id.; Walling v. 
Metcalfe, 863 S.W.2d 56, 57 (Tex. 1993). To obtain a temporary injunction, 
the applicant must plead and prove three specific elements: (1) a cause of 
action against the defendant; (2) a probable right to the relief sought; and (3) 
a probable, imminent, and irreparable injury in the interim. Butnaru, 84 
S.W.3d at 204.
        Whether 
to grant or deny a temporary injunction is within the trial court's sound 
discretion. Id. A reviewing court should reverse an order granting 
injunctive relief only if the trial court abused that discretion. Id. A 
trial court abuses its discretion if it grants a temporary injunction when the 
evidence fails to furnish any reasonable basis for concluding that the applicant 
has a probable right of recovery. Camp v. Shannon, 162 Tex. 515, 348 
S.W.2d 517, 519 (1961). To show a probable right of recovery, the applicant need 
not establish that it will finally prevail in the litigation, but it must, at 
the very least, present some evidence that, under the applicable rules of law, 
tends to support its cause of action. In re Tex. Nat. Res. Conserv. Comm’n, 
85 S.W.3d 201, 204 (Tex. 2002); Camp, 348 S.W.2d at 519.
        A 
person is liable for disclosure or use of trade secrets if (1) he discovers the 
secret by improper means or (2) his disclosure or use, after properly acquiring 
the knowledge, constitutes a breach of confidence reposed in him by the other in 
disclosing the secret to him. Hyde Corp. v. Huffines, 158 Tex. 566, 314 
S.W.2d 763, 769, cert. denied, 358 U.S. 898 (1958); Mabrey v. 
Sandstream, Inc., 124 S.W.3d 302, 310 (Tex. App.—Fort Worth 2003, no 
pet.). As a general rule, in the absence of an enforceable agreement not to 
compete, an employer is not entitled to an injunction preventing a former 
employee from soliciting the employer’s clients. Rugen v. Interactive Bus. 
Sys., Inc., 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ). A former 
employee is, however, precluded from using for his own advantage, and to the 
detriment of his former employer, confidential information or trade secrets 
acquired by or imparted to him in the course of his employment. Id. Rugen, 
864 S.W.2d at 551.
        A 
trade secret is “any formula, pattern, device or compilation of information 
which is used in one's business and presents an opportunity to obtain an 
advantage over competitors who do not know or use it.” In re Bass, 113 
S.W.3d 735, 739 (Tex. 2003). It may include a list of customers. Hyde Corp., 
314 S.W.2d at 776; Rugen, 864 S.W.2d at 552. But before information can 
be termed a “trade secret,” there must be a substantial element of secrecy. Rugen, 
864 S.W.2d at 552. To determine whether a trade secret exists, courts apply a 
six-factor test: (1) the extent to which the information is known outside of the 
employer’s business; (2) the extent to which it was known by employees and 
others involved in the business; (3) the extent of the measures taken by the 
employer to guard the secrecy of the information; (4) the value of the 
information to the employer and its competitors; (5) the amount of effort or 
money expended by the employer in developing the information; and (6) the ease 
or difficulty with which the information could be properly acquired or 
duplicated by others. Bass, 113 S.W.3d at 739.
IV. Probable Right of Recovery
        When 
applied to this case, the Bass factors show that the Estate has not 
established a probability of success in proving, at trial on the merits, that 
its clients’ identities deserve trade secret protection.
          

A.    Extent to Which Information Was Known Outside 
Corporation’s Business
 
        The 
record shows that the identities of “a lot” of the Plano office’s clients 
were known outside the Corporation’s business because many of the clients knew 
each other. In addition, Sands testified that the names of clients came up in 
casual conversation with other clients and on social occasions. For instance, if 
asked at a social gathering whether he knew a particular person, Sands would say 
yes (if he did) and, if the person was client, would mention this fact. Sands 
explained that he “never really gave . . . much thought” to this practice of 
his because he considered the clients’ identities public information. Further, 
when prospective clients asked Sands for references, he gave them the names of 
the Corporation’s existing clients. He and Buys had no agreement preventing 
this, nor was he aware of any ethical rules prohibiting it.
          B. 
   Extent to Which Clients’ Identities Were Known 
to Employees and Others in the Business
 
        The 
identities and addresses of the Plano office’s clients were completely 
available to Sands and all the other employees and independent contractors in 
the Plano office. They were also accessible to employees from the 
Corporation’s Las Colinas office. Buys and another employee routinely accessed 
information on the Plano office’s computers from the Las Colinas office. 
Further, the independent contractors at the Plano office were practicing 
accountants who worked only part-time for the Corporation. At least one of these 
individuals was free to maintain his own accounting practice while he worked for 
the Corporation. Many of the Plano office’s clients were also known to Rick 
Lewis, the former owner of one of the accounting practices that Buys had 
acquired to start the Plano office. There is no evidence that the Corporation 
had a confidentiality agreement or covenant not to compete with Lewis.
        C.    Measures Taken by 
the Corporation to Guard the Secrecy of Client Identities
  
        The 
Corporation made few, if any, efforts to guard client identities. For instance, 
in addition to giving its employees and independent contractors complete access 
to client information, the Corporation had no confidentiality policies and did 
not require its employees to sign confidentiality or nondisclosure agreements. 
Further, Sands was never asked to sign such an agreement as an independent 
contractor or as manager of the Plano office. Although the covenant not to 
compete in the February 2000 sales agreement between Sands and the Corporation 
contained a confidentiality provision, that provision just covered Sands’s 
former clients, who comprised only about twenty of the over five hundred clients 
in the Plano office at the time of Buys’s death.[2]
        In 
addition, at Buys’s instruction the computers in the Plano office were left on 
twenty-four hours a day, and the information on them was accessible from the 
Corporation’s other offices. Thus, anyone with a computer password could 
access the names and addresses of all the Plano office’s clients at any time. 
Although each computer had its own password and firewall protection, the 
passwords were generally known to everyone in the Plano office.[3]
        The 
Estate points out that, two months before he sold his own business to Buys in 
February 2000, Sands faxed a client list to Buys on which individual client 
names were not listed because he wanted to protect his clients’ 
confidentiality. The Estate contends that Sands’s conduct is evidence that 
identities of the Corporation’s clients were confidential. We disagree. Even 
if relevant, evidence that Sands treated his clients’ identities as 
confidential while negotiating the sale of his business is not evidence that the 
Corporation treated its clients’ identities as confidential. The only personal 
knowledge upon which Carol Buys-Michela based her belief that Buys had 
considered his clients’ identities confidential was Buys’s statement that 
“it was his practice and his clients.”
 
        D.    Value 
of Client Identities to Corporation and Its Competitors
   
        There is some evidence 
that the clients’ identities, although not confidential, were valuable to the 
Corporation’s competitors. For example, Sands himself used this information. 
Before he was removed from the Plano office, Sands mentioned to one client by 
letter and as many as fifteen by telephone that he might be opening his own 
accounting practice.[4]  Sands also acknowledged 
that an accounting firm’s revenue would be negatively affected if its clients 
left.
   
        E. 
   Amount of Money or Effort Expended in Developing 
Information
 
        The 
record shows that the Corporation expended little, if any, money, time, or other 
resources in developing or compiling a list of its clients. Carol Buys-Michela 
testified that she had seen a customer list several times in the past and that 
she believed her attorney may have printed a partial list from the Plano 
office’s computers. There is no evidence, however, that such a list was made 
available or even known to the Corporation’s employees or independent 
contractors. Sands testified that the Plano office had no client or customer 
list that he was aware of and that he did not take one with him when he left.[5] Moreover, no client list was tendered at the temporary 
injunction hearing, even under seal.
  

        F.    Ease 
or Difficulty With Which Information Could Be Properly Acquired or Duplicated by 
Others
  
        Finally, 
there is evidence that information regarding the clients’ identities could be 
properly acquired by others fairly easily. For instance, after Sands was removed 
from the Plano office, six of the office’s clients sought him out and asked 
him to provide accounting services for them, even though Sands had not contacted 
them. Further, there is evidence that many of the clients’ identities were 
generally known, at least to each other, because they knew each other. Also, 
Sands testified that some of the Plano office’s clients were his personal 
friends.
        In 
addition, besides Sands, the Plano office had two full-time employees and three 
independent contractors who knew the identities of the Corporation’s clients. 
There is no evidence that any of these individuals was subject to a 
confidentiality or nondisclosure agreement, a temporary restraining order, or a 
temporary injunction.[6]  Consequently, anyone 
desiring to obtain the clients’ identities could obtain that information from 
them. The identities of many of the Plano office’s clients could also be 
obtained from Rick Lewis, one of the former owners of the accounting practices 
that Buys had acquired to start the Plano office.[7]
        Moreover, 
client identities could be acquired from David Harvey. Buys-Michela testified 
that the Estate had reached an agreement with Harvey for him to maintain the 
Plano office until matters were resolved in the probate court. The Corporation 
had sent letters to all the Plano office’s clients stating that Harvey would 
be assuming the Plano office’s practice. The Estate and Harvey had not, 
however, agreed on a purchase price for the Plano office practice, and there is 
no evidence that the Corporation obtained a confidentiality or noncompete 
agreement from Harvey in the interim or in the event the sale fell through. 
Therefore, Harvey could disclose the clients’ identities to others or, at the 
very least, compete with the Corporation himself. Indeed, Harvey had attempted 
to discuss the Plano office’s clients with Sands, but Sands had given him no 
information because of the temporary restraining order.
V. Conclusion
        In 
summary, the evidence presented at the temporary injunction hearing clearly 
shows that the identities of the Corporation’s clients, although of some value 
to the Corporation and its competitors, were not confidential. Indeed, the only 
evidence of confidentiality presented at the hearing was the Corporation’s use 
of passwords and firewall protection on its computers—precautionary measures 
that are virtually universal on office and home computers alike. The evidence 
further shows that many of the clients’ identities were known outside the 
Corporation’s business and could be easily and properly acquired by others.
        Because 
the record is virtually devoid of evidence that the identities of the 
Corporation’s clients are trade secrets, it provides no reasonable basis for 
concluding that those identities are entitled to trade secret protection until 
trial on the merits. See Bass, 113 S.W.3d at 739; Camp, 348 S.W.2d 
at 519; Mabrey, 124 S.W.3d at 311. Accordingly, we hold that the trial 
court abused its discretion by granting the temporary injunction in this case. See 
Camp, 348 S.W.2d at 519. We sustain Sands’s first issue,[8] 
reverse the temporary injunction, and render judgment denying the Estate’s 
request for a temporary injunction.
   
   
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
   
  
   
PANEL A:   CAYCE, 
C.J.; LIVINGSTON and MCCOY, JJ.
 
DELIVERED: March 10, 2005


NOTES
1.  
The Estate does not contend on appeal that the temporary injunction would also 
have been proper based on the covenant not to compete.
2.  
As an aside, we note that Sands has not been enjoined from doing business with 
nearly fifty of his seventy former clients who continued their association with 
the Colleyville office rather than transferring back to the Plano office after 
Sands became manager there. The trial court ruled that the covenant not to 
compete, which precluded Sands from doing business with these clients, was 
unenforceable, and the temporary injunction only enjoins Sands from doing 
business with clients he had serviced while working as an independent contractor 
or employee of the Corporation. Sands never performed any work for the 
Corporation’s Colleyville office.
3.  
One or more of the passwords was also known to at least one employee in the Las 
Colinas office, who routinely accessed information on the Plano office’s 
computers.
4.  
Sands also testified that he’d had face-to-face conversations with six other 
clients, but he did not contact them. Instead, when they became aware that he 
was no longer at the Plano office, they went to his home and asked if he would 
do their accounting work. Sands had not contacted any of the Corporation’s 
clients since his removal from the Plano office.
5.  
Sands testified that he took nothing with him when he was removed from the Plano 
office except his personal time log. Later, he was allowed to return to the 
office with his attorney to retrieve his personal signature stamp.
6.  
Sands testified that Nancy Sigley, the Plano office’s bookkeeper, was also 
removed from the office on the same day he was; however, Sigley is not mentioned 
in the temporary restraining order or temporary injunction.
7.  
Sands testified that, when he began working as the Plano office’s manager in 
2002, about sixty-five percent of its clients were from the two accounting 
practices that the Corporation had acquired. John Gilliad, the former owner of 
the second practice, worked as an independent contractor for the Corporation, 
although not exclusively. He was also free to maintain his own accounting 
practice.
8.  
In light of our disposition of Sands’s first issue, we need not consider his 
remaining three issues. See Tex. 
R. App. P. 47.1 (only requiring court of appeals to address issues raised 
that are necessary to final disposition of appeal).