2026 Tex. Bus. 10



The Business Court of Texas,
Eleventh Division

| | | |
|---|---|---|
| MESQUITE ENERGY, INC. f/k/a SANCHEZ ENERGY CORPORATION, ON ITS BEHALF AND AS THE ASSIGNEE OF EVOLVE TRANSITION INFRASTRUCTURE, LP F/K/A SANCHEZ MIDSTREAM PARTNERS LP F/K/A SANCHEZ PRODUCTION PARTNERS LP | § § § § § § § | |
| *Plaintiff,* | § § | Cause No. 24-BC11B-0018 |
| v. | § | |
| SANCHEZ OIL & GAS CORPORATION, | § | |
| *Defendant.* | § § | |

---

**OPINION**

---

***Syllabus[1]***

This opinion addresses the division of settlement funds and the entitlement to reimbursement of litigation expenses arising from a prior lawsuit. The settlement funds were placed in an escrow account in 2024 pending the resolution of the present dispute.

---

[1] Note: The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.

## INTRODUCTION

¶1      The Court held a bench trial from January 12 through January 16, 2026, during which it received live testimony from seven witnesses, deposition designations, and exhibits. The parties subsequently submitted post-trial briefs on January 30, 2026.

¶2      Plaintiff in this case is Mesquite Energy, Inc., a corporation organized under the laws of Delaware, and which has its principal place of business in Houston, Texas. From its formation until June 30, 2020—when Sanchez Energy Corporation ("SN") changed its name to Mesquite following its emergence from bankruptcy—Mesquite was known as SN. Mesquite and SN are the same entity. These findings refer to "SN" when referring to the period of time before June 30, 2020, and to "Mesquite" when referring to the period of time after that date. Mesquite brings this case on its own behalf and on behalf of Evolve Transition Infrastructure LP, formerly known as Sanchez Midstream Partners LP, formerly known as Sanchez Production Partners LP ("SNMP").

¶3      Defendant in this case is Sanchez Oil & Gas Corporation ("SOG"), a corporation organized under the laws of Delaware, and which has its principal place of business in Houston, Texas.

¶4      At issue in this case is the proper allocation of settlement proceeds resulting from a prior trade secret misappropriation lawsuit, *Sanchez Oil & Gas Corporation, Sanchez Energy Corporation, and Sanchez Production Partners, LP v. Terra Energy Partners LLC, Benjamin "BJ" Reynolds, Mark Mewshaw, and Wes Hobbs,* Cause No. 2016-18909, 11th Judicial District Court, Harris County, Texas (the "*Terra* Litigation").

¶5     This case presents three principal questions. First, whether SNMP possessed an independent ownership interest in the trade secrets sufficient to support allocation of a separate share of the *Terra* settlement proceeds[2] through assignment. Second, whether the Services Agreement or other governing principles establish exclusive ownership of the Zero Dark Forty trade secrets in either Mesquite or SOG. Third, whether the 2022 post-bankruptcy Settlement Agreement between Mesquite and SOG affects the parties' entitlement to the proceeds or reimbursement of litigation expenses.

¶6     Having considered all the testimony, admitted exhibits, and arguments of counsel, the Court submits the following Findings of Fact and Conclusions of Law. To the extent necessary, all findings of fact that are labeled conclusions of law should also be considered findings of fact and vice versa.

## ¶7     FINDINGS OF FACT

1. SOG was founded in 1972 by A.R. Sanchez, Jr., his father, and other investors. Over time, the other investors exited SOG, and it became a family-owned, independent oil and gas exploration and production company.

2. In August 2011, the Sanchez Family formed the Sanchez Energy Corporation, now known as Mesquite Energy, Inc., as an oil and gas exploration and production company. In December 2011, SN went through an Initial Public Offering.

---

[2] On December 18, 2025, Defendant Sanchez Oil & Gas Corporation filed a Motion to Seal Records regarding certain settlement agreement information. The court granted that motion on January 6, 2026. Considering that order, no specific dollar amounts regarding settlement proceeds or sums to be reimbursed are included in this opinion.

3. On December 19, 2011, a Service Agreement was executed between SN and SOG. PX 5. Under the Services Agreement, SOG provided management and administrative support services to SN. *Id.*

4. These services were performed by SOG employees, and SN reimbursed SOG for those services without markup.

5. This agreement was signed by Tony Sanchez III on behalf of both companies. PX 5.

6. In May 2014, SN acquired the Catarina Asset in the Eagle Ford Shale from Shell for $639 million. During the relevant time period, SN and SOG operated in coordination on the development of the Catarina Asset.

7. Following the acquisition of the Catarina Asset and amid declining oil prices, SN and SOG developed a cost-reduction project called "Zero Dark Forty." The project successfully reduced drilling and operational costs at the Catarina Asset by a significant amount.

8. The creation and implementation of Zero Dark Forty involved coordinated participation by both SN and SOG.

9. SN paid the direct operational costs, employee salaries, and capital expenses associated with the program, while SOG employees performed, directed, and oversaw the operations required for its implementation.

10. In 2016, former SOG employees Benjamin "B.J." Reynolds, Mark Mewshaw, and Wes Hobbs departed SOG and subsequently joined Terra Energy Partners. Those individuals downloaded and copied thousands of proprietary files, including data

and trade secrets associated with the Zero Dark Forty project. The stolen proprietary files were provided to their new employer, Terra Energy Partners.

11. In March 2016, SOG, SN, and SNMP (the "*Terra* plaintiffs") filed suit in Harris County District Court against the former employees and Terra Energy Partners, asserting claims arising from alleged misappropriation of proprietary data and trade secrets, including the Zero Dark Forty project.

12. At trial in the present case, Gregory Kopel—currently General Counsel for Mesquite and previously counsel to SN and SOG—testified that SNMP was included as a co-plaintiff in the *Terra* Litigation because a substantial volume of information had been stolen and the plaintiffs sought to act quickly. Trial Tr. Vol. I at 294:17–23.

13. Tony Sanchez III, who was President, CEO, and Chairman of SN as well as President of SOG for the relevant period, testified that SNMP was included in the *Terra* Litigation because, at the outset, it was unclear which specific data belonged to which entity. Trial Tr. Vol. III at 142:15–143:6.

14. The law firm retained to represent the *Terra* plaintiffs initially billed them on an hourly basis. PX 42.

15. The attorney's fees and litigation costs associated with the prosecution of the *Terra* Litigation were paid solely by SN until March 2019.

16. In March 2019, the *Terra* plaintiffs amended the retention agreement entered into with the attorneys representing them to proceed on a contingency fee basis regarding future attorneys' fees. PX 43.

17. In August 2019, SN filed for Chapter 11 bankruptcy protection. SN emerged from bankruptcy in June 2020 as Mesquite Energy, Inc.

18. On September 12, 2022, the parties entered into a Settlement Agreement resolving claims asserted against SOG and members of the Sanchez family during the bankruptcy proceedings.

19. The Settlement Agreement released SOG from claims Mesquite possessed as of the effective date of September 12, 2022.

20. The *Terra* Litigation was resolved in 2024 through a negotiated settlement. After deduction of the plaintiff's attorney's contingency fee, the net settlement proceeds were placed into escrow.

## ¶8  CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action under Tex. Gov. Code §25A.004(d)(1) because it arises out of a "qualified transaction." The case arises out of a qualified transaction because the claims involve "a transaction, or series of related transactions . . . under which" either Plaintiff or Defendant "is entitled to receive, consideration with an aggregate value of at least $5 million." Tex. Gov. Code §25A.001(14). The parties have agreed that each party is subject to the Court's personal jurisdiction in this action. The parties further agree that venue is proper in Harris County under Tex. Civ. Prac. & Rem. Code §15.002(a)(1) because all or a substantial part of the events or omissions supporting Plaintiff's and Defendant's claims occurred in Harris County, and under Tex. Civ. Prac. & Rem. Code

§15.002(a)(2) because Plaintiff's and Defendant's principal offices are located within Harris County.

**SNMP's Role in the *Terra* Litigation**

2. The principle that an assignee acquires only the rights possessed by the assignor has been consistently recognized across Texas courts and represents a fundamental tenet of assignment law in Texas. *Boeing Co. v. Sw. Airlines Pilots Ass'n*, 716 S.W.3d 140, 154 (2025) ("An assignment of a legal claim does not relieve the assignee from the burden of proving what the assignor would have to prove to recover on the claim because the assignee acquires no greater rights than his assignor had." (citing *York's Adm'r v. McNutt*, 16 Tex. 13, 17 (1856)).

3. SNMP did not prove an independent ownership interest in the trade secrets at issue in the *Terra* Litigation. The trial record does not establish that SNMP owned trade secrets that were independently misappropriated, or that it suffered a distinct injury arising from stolen data related to the Zero Dark Forty project.

4. The court concludes that SNMP was included as a co-plaintiff in the *Terra* Litigation out of caution and expediency, given the volume of data that was stolen by the former employees. Accordingly, SNMP's prior status as a co-plaintiff and any subsequent assignment from SNMP could not expand SN's ownership interests or support allocation of a separate share of the *Terra* settlement proceeds to SN.

**Ownership of the Trade Secrets**

5.  The Court concludes that the settlement proceeds arising from the *Terra* Litigation are to be divided equally between Mesquite and SOG. The evidence presented at trial shows the trade secrets underlying the *Terra* Litigation were developed through the parties' joint efforts, and neither party proved exclusive ownership.

6.  Mesquite argues that under Texas law, whether a trade secret exists —and thus whether a plaintiff owns a trade secret—turns on "the amount of effort or money expended . . . in developing the information." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting Restatement of Torts §757 cmt. B. (1939)). In determining ownership of the trade secrets, Mesquite urges this court to look to which co-plaintiff incurred the costs associated with developing the specific information at issue in the *Terra* Litigation.[3]

7.  While the Court in *Bass* considered the amount of effort or money expended as one of six factors that may determine the existence of a trade secret, the Court also indicated "it is not possible to state precise criteria for determining the existence of a trade secret." *Id.* (quoting Restatement (Third) of Unfair Competition §39 cmt. d (1995)).

---

[3] The Texas Uniform Trade Secrets Act defines "trade secret" and "owner." TEX. CIV. PRAC. & REM. CODE ANN. §134A.002. In the present case, the court is not addressing whether a trade secret exists or who the owner is with respect to the misappropriation of a trade secret. The *Terra* plaintiffs proved the existence and ownership of trade secrets in the *Terra* Litigation. At issue in this case is the allocation of the settlement proceeds resulting from the successful prosecution of the *Terra* Litigation.

8. This Court finds that Mesquite did, in fact, fund the development of the Zero Dark Forty project. However, Texas law does not hold that the party providing funding automatically acquires exclusive ownership of proprietary information developed, as in this case, through collaborative operations.

9. While expended resources are probative of contribution, they are not dispositive of exclusive title to the trade secrets, particularly where the parties functioned in an integrated business relationship.

10. SOG argues that the Services Agreement and well-established contract law govern ownership of the trade secrets. SOG also argues that the Zero Dark Forty cost-saving initiatives were developed and implemented by SOG employees under SOG's operational control. As well as that, Mesquite's prior sworn statements in related proceedings serve as binding judicial admissions of SOG's ownership of the trade secrets. This court has examined the Services Agreement in full.

11. The intellectual property provision does not clearly and unequivocally assign to SOG exclusive ownership of newly developed trade secrets arising from joint operations. The agreement contains no express language divesting SN of ownership rights in information developed through the parties' coordinated efforts.

12. Importantly, witness testimony at trial demonstrated significant overlap in corporate leadership and operational control between the parties. Tony Sanchez III testified that he "was performing [his] duties as an executive officer of SN as SOG employee." Trial Tr. Vol. III at 64:22–25. Cameron George testified he held the roles of Senior Vice President of Capital Markets and later Chief Financial Officer

at both SN and SOG simultaneously. Trial Tr. Vol. I at 106:21–107:14. Mr. George described a general practice in which employees typically held the same titles at both companies. *Id.*

13. The record shows that numerous other individuals who were SOG employees during the relevant time testified that they served concurrent roles at both SN and SOG, with SOG paying their employment compensation while holding officer titles or job functions at SN. This overlapping leadership structure reflects that the development and implementation of the cost-saving initiatives from the Zero Dark Forty project did not occur through arm's-length dealings between fully distinct entities, in which SOG retained all operational control.

14. Similarly, the prior testimony cited by SOG does not constitute a conclusive judicial admission resolving this dispute. The statements were made in different proceedings addressing different issues. The evidence does not establish a clear, deliberate, and unequivocal concession of exclusive ownership that would be binding in the present action.

15. Accordingly, SOG did not prove sole ownership under either contract principles, by exercising exclusive control, or under the doctrine of judicial admissions.

16. The evidence at trial established that the Zero Dark Forty program was developed through coordinated and interdependent contributions by both Mesquite and SOG. Mesquite funded the project's capital and operating expenditures and owned the Catarina Asset, where the Zero Dark Forty cost-saving initiatives were implemented. SOG provided operational management by employing and directing

the personnel who engineered and executed the strategies. Both parties made substantial and indispensable contributions to the development of the Zero Dark Forty project, and no governing agreement assigns exclusive ownership of trade secrets to one party. The record establishes joint development, and therefore, the court concludes that Mesquite and SOG are co-owners of the Zero Dark Forty trade secrets.

**Effect of the 2022 Settlement Agreement**

17. The court concludes that the 2022 post-bankruptcy Settlement Agreement does not bar Mesquite's claim to its share of the *Terra* settlement proceeds. The release does not bar claims for reimbursement out of a settlement fund that did not exist until 2024.

**Reimbursement of Litigation Expenses**

18. SN paid all attorneys' fees and litigation costs to prosecute the *Terra* Litigation that were billed on an hourly rate from the start of the litigation in March 2016 until March 2019. Under the doctrine of unjust enrichment, when a party passively receives a benefit that would be unconscionable to retain without payment, the law implies an obligation to restore those benefits.

19. "Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Eun Bok Lee v. Ho Chang Lee*, 311 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.)

(citing *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). "When a person has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon that person to restore the benefits to the plaintiff." *Id.*

20. SN bore one hundred percent (100%) of the financial risk and burden of prosecuting the *Terra* Litigation. Without SN's funding, the settlement proceeds would not exist. SOG is receiving half of the settlement benefit. Therefore, it shall be legally and equitably required to bear half of the litigation costs.

**CONCLUSION**

¶9      The proceeds from the *Terra* settlement shall be divided equally, as each party is entitled to fifty percent (50%) of the settlement proceeds. From their share of the *Terra* settlement proceeds, SOG is ORDERED to pay Mesquite half of the legal expenses SN paid to prosecute the *Terra* Litigation prior to March 2019. The court will issue a Final Judgment concurrently with the filing of this opinion.

**SO ORDERED.**

_____
MARIALYN BARNARD
Judge of the Texas Business Court

SIGNED ON: March 4, 2026