**In re Lee M. BASS, Lee M. Bass, Inc., and Palladian Corporation, Relators.**

No. 02–0071.

Supreme Court of Texas.

Argued Dec. 11, 2002.

Decided July 3, 2003.

Rehearing Denied Sept. 25, 2003.

Robert C. Grable, Bart A. Rue, Todd W. Spake, Kelly Hart & Hallman, P.C., Fort Worth, Brenda L. Clayton, Austin, for Relator.

Roger Sherman Braugh, Jane Margaret Braugh, Sico White & Braugh, L.L.P., Jacobo G. Munoz, Hilliard & Munoz, Juan Enrique Mejia, David T. Bright, Watts & Heard, Corpus Christi, for Respondent.

Justice SCHNEIDER delivered the opinion of the Court.

The Texas Rules of Evidence protect trade secrets from discovery "if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice." TEX.R. EVID. 507. We held in *In re Continental General Tire, Inc.*, 979 S.W.2d 609 (Tex.1998), that a party asserting the trade secret privilege has the burden of proving that the discovery information sought qualifies as a trade secret. If met, the burden shifts to the party seeking trade secret discovery to establish that the information is necessary for a fair adjudication of its claim.

Here, non-participating royalty interest owners are attempting discovery of the mineral estate owner's geological seismic data to prove that the mineral estate owner breached an implied duty to develop its land. The mineral estate owner claims that the data are trade secrets. The trial court found that the royalty owners met their burden of establishing necessity and ordered the mineral estate owner to produce the data under a protective order. The court of appeals denied the mineral estate owner's requested mandamus relief. The mineral estate owner now seeks mandamus relief from this Court to prevent discovery of the claimed trade secrets.

The issues before us today are: 1)whether the mineral estate owner proved that the seismic data at issue are trade secrets; and 2) if the mineral estate owner proved the data are trade secrets, whether the non-participating royalty interest owners established that the discovery of the trade secret information was necessary to a fair adjudication of their breach of an implied duty claim. We hold that geological seismic data are trade secrets and that the non-participating royalty interest owners failed to establish the existence of a claim against the mineral estate owner justifying discovery of the trade secret data. We therefore conditionally grant mandamus relief and order the trial court to vacate its order compelling the seismic data's production.

## I. BACKGROUND

Real parties in interest, the non-participating royalty interest owners (the McGills), sued Relator, the mineral estate owner (Bass), for multiple claims in the trial court. The relevant claim for the purpose of this mandamus is the McGills' assertion that Bass breached an implied duty to the McGills to develop his land.

Bass owns the surface and mineral estate of La Paloma Ranch—a large tract of land in Kenedy and Kleberg counties. The Ranch is made up of multiple tracts of land, which Bass purchased from the

McGills and their predecessors in interest. The disputed land tract here is the former Erck property—approximately 22,000 acres within the La Paloma Ranch. The Erck property was originally part of the McGill family ranch. The McGill family ranch was partitioned between three brothers, J.C. McGill, H.F. McGill, and Scott McGill in 1954. Although both surface and minerals were partitioned, each of the brothers retained a 1/3rd of 1/8th non-participating royalty interest in the other two brothers' partitioned land.

As sole daughter and heir of J.C. McGill, Anne McGill Erck inherited her father's land. Bass purchased the Erck property from Ann McGill Erck's bankruptcy sale in 1990. The Erck property general warranty deed to Bass clearly recognizes the encumbrance of the royalty interests that the other McGill brothers own. Here, Relators are the heirs of Scott McGill, and their non-participating royalty interest in the Erck property is less than 2%.

In the mid-nineties, Bass contracted with Exxon to run a geological survey of seismic activity on the entire La Paloma Ranch. Bass has never opted to lease the land for development. The McGills claim that by refusing to lease and thus develop the land, Bass has breached an implied duty to the royalty interest holders. To prove that Bass breached this duty, the McGills claim access to Bass' seismic data is necessary because the data will reveal whether development would be profitable. The trial court ordered production of the data subject to a protective order.

The trial court order did not expressly find that the seismic activity data are trade secrets. Bass contends the data are trade secrets, and thus, Bass sought mandamus relief from the court of appeals, which denied relief in a per curiam order. Bass now seeks relief from this Court, arguing that the data are trade secrets and that the McGills have not shown entitlement to the seismic information.

## II. STANDARD OF REVIEW

■■■ "Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992); *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). Thus, evaluating whether mandamus relief should be granted requires that we determine whether there has been a clear abuse of discretion by the trial court and whether an adequate appellate remedy exists. *Walker*, 827 S.W.2d at 839.

## III. ANALYSIS

### A. Abuse of Discretion

■■ Abuse of discretion occurs when the trial court "reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Walker*, 827 S.W.2d at 839.

■■ In *In re Continental*, we held that "[w]hen trade secret privilege is asserted as the basis for resisting production, the trial court must determine whether the requested production constitutes a trade secret; if so, the court must require the party seeking production to show reasonable necessity for the requested materials." 979 S.W.2d at 611(quoting *Rare Coin–It, Inc. v. I.J.E., Inc.*, 625 So.2d 1277 at 1278(Fla.Dist.Ct.App.1993). If a trial court orders production once trade secret status is proven, but the party seeking production has not shown a necessity for the requested materials, the trial court's action is an abuse of discretion. *Id.*

### (1) Whether geological seismic data constitute trade secrets

Under the first prong of *In re Continental*, we must determine whether the geological seismic data constitute trade secrets.

We have held that a trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Intern. v. Altai*, 918 S.W.2d 453, 455 (Tex.1994). However, we have never stated whether geological seismic data qualify as trade secrets.

To determine whether a trade secret exists, this Court applies the Restatement of Torts' six-factor test:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

RESTATEMENT OF TORTS § 757 cmt. B. (1939); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's n. cmt. d. *See generally Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763 (1958). The original Restatement's section 757 has been omitted from the Restatement (Second) of Torts and incorporated into the Restatement (Third) of Unfair Competition. Likewise, the six factor test from section 757 cmt. B., is discussed in the Unfair Competition Restatement reporter's notes. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 reporter's n. cmt. d ("In determining the existence of a trade secret, many cases rely on the factors identified in Restatement of Torts § 757 cmt. B"). The Restatement of Unfair Competition treats the factors as relevant, but not dispositive, criteria:

It is not possible to state precise criteria for determining the existence of a trade secret. The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. d (1995).

Though we have never specifically addressed the Restatement changes, many other jurisdictions continue to apply and treat the six factors as relevant criteria used to determine if something is a trade secret.[1] Texas courts of appeals who continue to apply this test are split on whether the six-factors should be weighed as

---

1. *See Hammock v. Hoffmann–LaRoche, Inc.*, 142 N.J. 356, 662 A.2d 546, 560 (N.J.1995) (factors are "additional considerations that we find useful"); *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 918 (Ind.1993)("[a]lthough all of the Restatement's factors no longer are required to find a trade secret, those factors still provide helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of the statute")(citing *Optic Graphics, Inc. v. Agee*, 87 Md.App. 770, 591 A.2d 578, 585 (Md.1991)); *see also Minuteman, Inc. v. Alexander*, 147 Wis.2d 842, 434 N.W.2d 773, 778 (1989); *Nalco Chem. Co. v. Hydro Tech., Inc.*, 984 F.2d 801, 803–04(7th Cir.1993); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir.1993); *Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990)("In determining whether a trade secret exists, the New York courts have considered the [ ] factors to be relevant"); *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir.1985) (factors are "to be considered in determining whether given information is a trade secret").

relevant criteria or whether a person claiming trade secret privilege must satisfy all six factors before trade secret status applies. *See American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 n. 2 (Tex.App.-Waco 1996, no writ.) (the factors are "to be considered in determining whether given information is a trade secret"); *Expo Chem. Co. v. Brooks*, 572 S.W.2d 8, 11 (Tex.Civ.App.-Houston [1st Dist.] 1978, *rev'd on other grounds*, 576 S.W.2d 369 (Tex.1979)); *but see Birnbaum v. Alliance of Am. Insurers*, 994 S.W.2d 766, 783 (Tex. App.-Austin 1999, pet. denied) (all six factors "must be established by a claimant"). Not surprisingly, the McGills argue that in order for the seismic data to qualify as a trade secret, Bass must satisfy all six factors. Conversely, Bass argues that the six-factors constitute a non-exclusive balancing test.

■ In determining which position is correct, we begin by noting again that the Restatement (Third) of Unfair Competition regards the test as relevant but not dispositive, as "[it] is not possible to state precise criteria for determining the existence of a trade secret." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. d. We agree with the Restatement and the majority of jurisdictions that the party claiming a trade secret should not be required to satisfy all six factors because trade secrets do not fit neatly into each factor every time. *See id.* We additionally recognize that other circumstances could also be relevant to the trade secret analysis. Thus, we will weigh the factors in the context of the surrounding circumstances to determine whether geological seismic data qualify as trade secrets.

■ It is undisputed that the oil and gas industry typically treats seismic data and other methods for obtaining subsurface geological information as trade secrets. Other jurisdictions have recognized this industry wide practice of treating seismic data as trade secrets. *See Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 569 (5th Cir.2000); *Tidelands Royalty "B" Corp. v. Gulf Oil Corp.*, 804 F.2d 1344, 1351 (5th Cir.1986); *Phillips Petroleum Co. v. Stryker*, 723 So.2d 585, 587 (Ala. 1998); *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 918 (Ind.1993).

The Alabama Supreme Court, for example, mentioned seismic data and its status as a trade secret in *Stryker*, 723 So.2d at 587. *Stryker* involved a parcel of property drilled for oil and gas by Phillips Petroleum Company. *See id.* The owners of property outside this parcel of land brought an action against Phillips, alleging that the company had improperly drained their land of gas and gas condensate, that Phillips caused a waste of condensate, and that Phillips had acted fraudulently in failing to disclose the extent to which their property was being drained. *See id.* at 587. In connection with Phillips' unwillingness to share its seismic research with a company to whom the plaintiffs had executed leases on their property, the court observed that seismic research is "very expensive research usually treated as a trade secret." *Id.*

The Fifth Circuit likewise recognized the confidential nature of seismic data in *Musser*, 201 F.3d 561 at 569. In *Musser*, the court addressed the rights of each party under an oil and gas lease with respect to seismic exploration. The assignee of a mineral lease, Union Pacific Resources (UPR), sought to obtain from Musser Davis Land Company a seismic permit before conducting a seismology survey of the lands and offered to pay $7,290 for anticipated incidental property damages. *See id.* Musser Davis refused, and negotiations ensued. When negotiations eventually failed, UPR informed Musser Davis of its intention to conduct the survey

under the lease without a special permit. Musser obtained, in state court, a temporary restraining order preventing UPR from conducting seismic exploration of the land or transferring seismic data to third parties. *See id.* Upon removal, the federal district court granted declaratory relief to Musser Davis. The Fifth Circuit reversed on appeal, stating that "a mineral lessee or permitee ordinarily acquires a valuable exclusive property right in data derived from its geophysical survey." *Id.* at 569 (citing *Tidelands Royalty,* 804 F.2d at 1351(exploration company that conducted geophysical survey on federal lands owned resulting confidential data and could sell it to lessee production company for fee and overriding royalties)).

Moreover, in *Laird,* 622 N.E.2d at 920–21, the Indiana Supreme Court held that information regarding the potential location of oil fields is entitled to trade secret protection. In that case, Amoco Production Company used microwave radar technology to obtain oil reserve data. *See id.* An Amoco geologist consulted as an expert in this technology sent a competitor a facsimile transmission of a page from a road atlas upon which he had drawn circles indicating the location of potential reserve sites. *See id.* The competitor, Laird, then used this information to obtain oil and gas exploration leases for a substantial portion of these reserve locations. Amoco filed an action against Laird, seeking, in part, a preliminary injunction prohibiting Laird from pursuing or developing oil and gas leases defined by the road atlas and from using or disclosing any other information gained from the discovery or litigation of the case. *See id.* The court held that the information pertaining to the location of the oil reserve sites was entitled to trade secret protection. The court further observed that "[w]ithout the availability of [trade secret] protection, particularly with respect to exploration of subterranean nat-

ural resources, corporations and individuals would not risk the large sums of money for geophysical exploration, an expensive but only infrequently rewarding adventure." *Id.* at 921 (citing MILGRIM, ON TRADE SECRETS, § . 2.09 (1993)).

Having determined that seismic data are treated as trade secrets both in the industry and in the courts of several jurisdictions, we now apply the Restatement's six-factor test to determine whether Bass' 3–D geological seismic data constitute trade secrets under these circumstances. The first enumerated factor involves the extent to which the information is known outside the business. According to a Bass employee affidavit, Bass has at all times maintained the confidentiality of the data obtained from the seismic shoot. The affidavit states that it would be impossible for others to obtain this information without 1)paying a substantial sum for a license or right to view the existing data; or 2)paying an even larger amount to conduct another seismic survey, which could only be done with Bass' consent. A Bass geophysicist's testimony likewise reveals that the data and data interpretations were never shown to anyone outside Bass Enterprise Production Company (BEPCO) and Exxon. Exxon's access to the data stems from the Option Lease in which BEPCO paid Exxon to obtain the data through the seismic shoot. Thus, other than Exxon, who actually conducted the geological survey, Bass has not provided outside access to the data.

The second enumerated factor involves the extent to which the information is known by employees and others involved in Bass' business. The McGills claim certain employees of BEPCO have access to the data. However, BEPCO is Bass' operating agent and responsible for maintaining, managing, and operating all Bass' oil and gas interests. Expert testimony dem-

onstrates that only four BEPCO employees have seen the data—including the company's geophysicist whose job includes analyzing such data for Bass. We have held that a party may share trade secret information with its agents without endangering the trade secret's protection. *Huffines*, 314 S.W.2d at 769. Thus, because only four people have access to the data, all of whom are Bass' agents and employees, we believe that Bass has satisfied the Restatement's second factor as well.

The third factor considers the extent of measures taken to guard the secrecy of the information. In this case, the seismic data were considered highly valuable. The data were kept in a secured, climate regulated vault that was accessible only to those who knew the combination. An expert witness testified that "[t]o be able to even enter onto the work area, you have to have a security card to get in." This uncontested evidence suggests Bass has met the Restatement's third factor by vigilantly guarding the data.

Under the test's fourth factor, the information's value to Bass and its competitors must be taken into account. Bass' expert testimony states the data are a "vital commodity" upon which all interpretation of the land's value is based. The data provide the ability to construct a three-dimensional picture of the property's underground structural geology, and, as Bass claims, would be valuable to any oil and gas contractor interested in the area. The expert testimony puts the data's monetary value between $800,000 and $2,200,000. We believe these estimates, both high and low, are substantial figures highly favoring trade secret protection. Thus, we believe Bass has satisfied the Restatement's fourth factor.

The fifth factor considers the amount of money expended by Bass in developing the data. Bass claims that the shoot took several months to complete at considerable expense and inconvenience, but there is no evidence of a specific amount. Industry information suggests that exploration through the 3–D seismic data use is one of the most expensive exploration and development techniques in the oil and gas trade. *See* LINER, ELEMENTS OF 3–D SEISMOLOGY (1999); BROWN, *Interpretation of Three–Dimensional Seismic Data*, AMERICAN ASSOCIATION OF PETROLEUM GEOLOGISTS, Memoir 42 (4th ed.1996); SHERIFF, SOCIETY OF EXPLORATION GEOPHYSICISTS, ENCYCLOPEDIC DICTIONARY OF EXPLORATION GEOPHYSICS (3rd ed.1976). However, because the record is bare of information on this factor, we will not weigh it in Bass' favor.

We believe the final factor, the ease or difficulty with which the information could be properly acquired or duplicated by others, weighs strongly in Bass' favor. The evidence establishes that the cost of duplicating the seismic shoot would run between $800,000 and $2,200,000. And, to conduct another shoot, a party would have to get Bass' permission. Furthermore, to acquire the existing data from Bass, a party would have to obtain and that would include acquiring an expensive license or right to view—a cost necessarily determined by Bass. Geological seismic data is given industry-wide trade secret protection in oil and gas trade. Other jurisdictions that have considered geological seismic data have adopted the industry's position and deemed this data trade secrets. And, under the six factors, the record demonstrates that the evidence weighs in favor of trade secret protection. We therefore hold that seismic data and its interpretations are trade secrets protected by Texas Rule of Evidence 507.

**(2) Whether discovery is necessary for a fair adjudication**

We must now turn to *In re Continental's* second prong and determine if seismic data trade secret discovery is "necessary for a fair adjudication" of the McGills' claim. 979 S.W.2d at 612. Necessity depends on whether the trade secret's production is "material and necessary to the litigation." *Id.* at 615 (quoting *Automatic Drilling Mach., Inc. v. Miller*, 515 S.W.2d 256, 259 (Tex.1974). However, in order for trade secret production to be material to a litigated claim or defense, a claim or defense must first exist.

Here, the McGills claim that the trade secret data are necessary to show that Bass breached a fiduciary duty to the McGills to develop Bass' land. The duty to develop, according to the McGills, arises from the existing relationship between the mineral estate owner—Bass—and the royalty interest holders—the McGills. However, a duty to develop a mineral estate arises not from a fiduciary relationship, but from the implied covenant doctrine of contracts law in which courts read a duty to develop into an oil and gas lease when necessary to effectuate the parties' intent. *Danciger Oil & Ref. Co. v. Powell*, 137 Tex. 484, 154 S.W.2d 632, 635 (1941). Conversely, a fiduciary duty arises out of agency law based upon a special relationship between two parties. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex.2002). The McGills' argument confuses a fiduciary duty with a duty to develop; yet these two duties are distinct and have developed under different legal theories. Thus, we will first address whether Bass owes the McGills a duty to develop Bass' land under the implied covenant doctrine. And, we will then address whether Bass owes the McGills a fiduciary duty based upon the two parties' existing relationship under the Erck property deed.

### a). Implied Covenant to Develop Land

We have consistently stated that implied covenants are not favored by law and will not be read into contracts except as legally necessary to effectuate the plain, clear, unmistakable intent of the parties. *Powell*, 154 S.W.2d at 635; *Freeport Sulphur Co. v. Am. Sulphur Royalty Co.*, 117 Tex. 439, 6 S.W.2d 1039, 1042 (1928). "It is not enough to say that an implied covenant is necessary in order to make the contract fair ... It must arise from the presumed intention of the parties as gathered from the instrument as a whole." *Powell*, 154 S.W.2d at 635. From these propositions, oil and gas jurisprudence recognizes an implied covenant to develop land in oil and gas leases after oil and gas are discovered in paying quantities. *Powell*, 154 S.W.2d at 635. "The evident intent of the parties in the execution of [the mineral lease] being the production of such minerals, possible only through operation and development, the obligation to operate with reasonable diligence and to reasonably develop the land, will be implied in order to effectuate this intent." *Grubb v. McAfee*, 109 Tex. 527, 212 S.W. 464, 465 (1919).

No oil and gas lease exists here. Bass owns the Erck property, surface and mineral estate, in fee simple absolute. The McGills hold less than a 2% nonparticipating royalty interest in the Erck mineral estate. Bass acquired the general warranty deed to the Erck estate in Ann McGill's bankruptcy sale in 1990. There is nothing in the record to indicate this general warranty deed is anything other than a typical real estate transaction involving the conveyance of a fee simple estate. *Powell*, 154 S.W.2d at 635–636. An implied covenant to develop a mineral estate has never been read into general warranty deeds in Texas because the parties' intent

in transferring a fee simple absolute estate could rarely, if ever, be said to place the grantor in a position to develop the land for the grantee. *Powell,* 154 S.W.2d at 635. We see no reason today to imply such a covenant as doing so would potentially place many Texas landowners in a position of owing a duty to remote royalty interest holders that would burden fee simple estates in a manner contrary to traditional property law.

Accordingly, we refuse to imply a covenant into the Erck property deed. Bass, as the Erck property owner, therefore owes no implied duty to develop his land to the McGills, as remote royalty interest holders, under the doctrine of implied covenants.

### b). *Fiduciary Duty*

 The McGills rely on our holdings in *Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984), and *Schlittler v. Smith,* 128 Tex. 628, 101 S.W.2d 543, 545 (1937), for the proposition that a mineral estate owner owes non-participating royalty interest owners a fiduciary duty, or in the alternative, a duty of good-faith and fair-dealing to develop the mineral estate.

*Smith* involved a dispute over the meaning of the word "royalty" in a general warranty deed. 101 S.W.2d at 543. The grantor claimed that the reservation of a "royalty" interest included bonuses and rental payments. *Id.* at 544. Nonetheless, we held that the word "royalty" has a specific meaning in oil and gas law that does not include bonuses and rental payments. *Id.* And, although the deed did not explicitly state the royalty interest amount the grantor would receive if the land were developed, we stated that "self-interest on the part of the grantee may be trusted to protect the grantor as to the amount of royalty reserved. Of course, there should be the utmost fair dealing on the part of the grantee in this regard." *Id.* at 545.

Hence, *Smith* involved a very narrow duty in which a grantee, *after* executing a mineral lease, owes a duty of the utmost fair dealing to protect the amount of the grantor's royalty. 101 S.W.2d at 545. The *Smith* duty, therefore, arises in conjunction with the execution of a lease. Here, Bass has not executed an oil and gas lease. Accordingly, as grantee, Bass' duty to protect the amount of the McGill's royalty reservation does not arise until Bass executes a lease. *Smith,* 101 S.W.2d at 544–45. Hence, the McGill's reliance on *Smith* is misplaced. Furthermore, even if an oil and gas lease existed in this case, the McGills' royalty reservation amount is explicitly stated in the general warranty deed. Under the execution of a lease, Bass would be aware of exactly how much to pay the McGills if oil and gas were ever discovered on the Erck property. In *Smith,* the deed did not explicitly state the amount of the royalty reservation. *Id.* at 544. Therefore, the McGills' reliance on *Smith* is misplaced as *Smith* does not give rise to a duty in Bass because no lease has been executed and no royalty payment exists.

The McGills also rely on our holding in *Manges* to support their breach of fiduciary duty claim against Bass. 673 S.W.2d at 180. *Manges* involved a dispute between mineral estate co-tenants. *Id.* at 181. Manges purchased one-half of the mineral estate and executive leasing rights from the Guerra family with the Guerras retaining the other 50% ownership interest in the mineral estate. The Guerras sued Manges for self-dealing in leasing a portion of the estate to himself at unfair terms. *Id.* We stated that "[a] fiduciary duty arises from the relationship of the parties ... [t]hat duty requires the holder of the executive right, Manges in this case, to acquire for the non-executive every ben-

efit that he exacts for himself." *Id.* at 183–84. Accordingly, we held that Manges breached his fiduciary duty to the Guerras by making a lease to himself under numerous unfair terms. *Id.* at 184.

*Manges* extends the *Smith* duty by creating a fiduciary duty between executive and non-executive interest holders in mineral deeds. *Manges,* 673 S.W.2d at 180. Here, the McGills hold a non-participating royalty interest in Bass' mineral estate. By definition, all non-participating royalty interests are non-executive interests.[2] Thus, like *Manges,* the relationship between Bass and the McGills is one of executive and non-executive. Because *Manges* held that the executive owes the non-executive a fiduciary duty, the McGills correctly state that Bass owes them a duty to acquire every benefit for the McGills that Bass would acquire for himself. 673 S.W.2d at 184.

What differentiates this case from *Manges,* however, is that no evidence of self-dealing exists here. Bass has not leased his land to himself or anyone else. Bass has yet to exercise his rights as the executive. Because Bass has not acquired any benefits for himself, through executing a lease, no duty has been breached. Thus, the present facts are distinguishable from *Manges.*

Traditionally, a duty to develop land arises under an oil and gas lease either through an explicit provision in the lease or through an implied covenant to develop. No lease exists in this case. Furthermore, without exercising his power as an executive, Bass has not breached a fiduciary duty to the McGills as non-executives. Be-

cause the record both fails to demonstrate the existence of an oil and gas lease that would create an implied duty to develop and fails to show that Bass has breached his duty as the executive, we hold the trial court abused its discretion in compelling trade secret production. *In re Continental,* 979 S.W.2d at 615; *Walker,* 827 S.W.2d at 839.

### B. Adequate Remedy by Appeal

■ When an abuse of discretion exists, we must next determine whether the party resisting trade secret discovery has an adequate appellate remedy. We have held that no adequate appellate remedy exists if a trial court orders a party to produce privileged trade secrets absent a showing of necessity. *In re Continental,* 979 S.W.2d at 615. We have determined that the data are trade secrets and that the record is bare of any viable claim against Bass that would necessitate the production of the 3–D seismic trade secret data in this case. Thus, because the district court abused its discretion in compelling Bass to produce the data, there is no adequate appellate remedy, and therefore, we hold the McGills are not entitled to trade secret production.

### IV. CONCLUSION

Bass met his burden to show geological seismic data are trade secrets. Furthermore, because the record fails to establish the existence of a duty to develop or that Bass has breached a fiduciary duty, the McGills have not made the requisite showing of necessity under *In re Continental.*

---

**2.** *Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 789–790 (Tex.1995) (citing Lee Jones, *Non-participating Royalty,* 26 Tex. L.Rev. 569, 569 (1948)(A non-participating royalty interest consists of "an interest in the gross production of oil, gas, and other minerals *carved out of the mineral fee estate* as a free royalty, which does not carry with it the right to participate in the execution of, the bonus payable for, or the delay rentals to accrue under, oil, gas, and mineral leases executed by the owner of the mineral fee estate."); *See also* SHADE, PRIMER ON THE TEXAS LAW OF OIL AND GAS, 14 (2nd ed.1998).

Hence, the trial court abused its discretion compelling Bass to produce the trade secrets, and no adequate appellate remedy exists. Therefore, we conditionally grant mandamus relief and order the trial court to vacate its order compelling the production of Bass' seismic data. The writ will issue only if the trial court fails to act in accordance with this opinion.