RELIANT HOSPITAL PARTNERS, LLC, Nautic Partners, LLC, Michael Brohm, Patrick Ryan, Kenneth McGee, Jerry Huggler, Chad Deardorff, Addison Resolution, LLC f/k/a Reliant Hospital Partners, LLC, Scott Hilinski, James Beakey, Chester Crouch, and Emmett Moore, Appellants

v.

**CORNERSTONE HEALTHCARE GROUP HOLDINGS, INC.,**
**Appellee.**

No. 05–11–00952–CV.

Court of Appeals of Texas, Dallas.

June 8, 2012.

Jonathan Clark Lamendola, Cobb Martinez Woodward, J., Mark W. Bayer, Joanne Early, Gardere, Wynne & Sewell, L.L.P., Keith A. Clouse, Alyson C. Brown, Gregory Michael Clift, Clouse Dunn Khoshbin LLP, Mark R. Steiner, Gary Fowler, Jackson Walker, L.L.P., Dallas, TX, Michael Brohn, Norcross, GA, Patrick F. Philbin, Kirkland & Ellis LLP, Washington, DC, John F. Hartman, Gabor Balassa, Kirkland & Ellis, Chicago, IL, for Appellants.

Marc D. Katz, Cristina I. Torres, Andrews Kurth, LLP, Dallas, TX, Scott A. Brister, David P. Whittlesey, Andrews Kurth, LLP, Austin, TX, for Appellee.

Before Justices O'NEILL, FRANCIS, and MURPHY.

## OPINION

Opinion By Justice O'NEILL.

Reliant Hospital Partners, LLC, Nautic Partners, LLC, Michael Brohm, Patrick Ryan, Kenneth McGee, Jerry Huggler, Chad Deardorff, Addison Resolution, LLC f/k/a Reliant Hospital Partners, LLC, Scott Hilinski, James Beakey, Chester Crouch, and Emmett Moore ("appellants") appeal the temporary injunction issued against them. We reverse and render as to appellant Moore and dissolve the temporary injunction against him. We modify the order of the trial court granting a temporary injunction against appellants Reliant Hospital Partners, LLC, Nautic Partners, LLC, Hilinski, Brohm, McGee, and Ryan, and affirm the order as modified.

### Background

This case involves numerous parties and entities involved in different segments of the health care industry. Appellee Cornerstone owns and operates long-term acute care hospitals ("LTACHs"). These facilities treat patients who have been released from acute care facilities, but are still seriously ill and require care by doctors and nurses for a longer time than can be accommodated by an acute care hospital. Appellants Brohm, McGee, Ryan, Huggler, and Deardorff held executive po-

sitions at Cornerstone.[1]

In 2010, Brohm and McGee were dissatisfied with Cornerstone and started exploring other options. One opportunity presented itself through appellant Crouch, who served as appellant Reliant Hospital Partners, LLC's ("Reliant") chief operating officer.[2] Brohm was familiar with Reliant because Crouch and McGee were long-time friends. Unlike Cornerstone, Reliant owned and operated inpatient rehabilitation facilities ("IRFs"), which make up a different market within the health care industry. IRFs do not typically treat seriously ill patients that require lengthy stays.

Brohm and McGee contacted Reliant's primary owner, appellant Moore, through an unsolicited email to see if he would be interested in selling Reliant. At the time, Moore was seeking new funding for Reliant and spoke with three hundred potential investors. Moore was familiar with Cornerstone and knew it operated LTACHs rather than IRFs; however, Brohm made it clear that he was not seeking to purchase Reliant on behalf of Cornerstone but rather was seeking to purchase it on his own behalf.

Brohm contacted appellant Nautic Partners, LLC ("Nautic") in November 2010 and proposed Nautic acquire Reliant and hire Brohm, McGee, and Ryan to run the company. Brohm's specific contacts with Nautic were appellants Hilinski and Beakey. After Nautic conducted its own due diligence regarding the potential acquisition of Reliant, Nautic moved forward with the acquisition.

Brohm informed Moore he had a potential buyer for Reliant. Brohm introduced Moore to Nautic, and Moore later negotiated the sale of Reliant to Nautic. After the sale, Reliant hired Brohm, McGee, Ryan, Huggler, and Deardorff, who had all resigned from Cornerstone.

Cornerstone later filed suit and an application for temporary injunction against all appellants. Cornerstone claimed appellants took its confidential and proprietary data when leaving the company and used the information to benefit themselves and Reliant. Cornerstone alleged the following causes of actions: (1) misappropriation of trade secrets, (2) breach of fiduciary duties, (3) harmful acts by computer in violation of Texas Civil Practice and Remedies Code section 143.001 and Texas Penal Code section 33.02, (4) Texas Theft Liability Act violations, (5) tortious interference, (6) conspiracy, (7) aiding and abetting, (8) conversion, and (9) business disparagement.

The trial court held a temporary injunction hearing during portions of six days from June 7, 2011 to July 1, 2011. The trial court signed an order against appellants. As to Nautic, Hilinski, Reliant, Brohm, McGee, and Ryan, the injunction prohibited the following conduct:

(1) retaining any electronic documents, originals, or hard copies of materials, property, documents, data and any other information obtained by any of Defendants Brohm, Ryan, McGee, Huggler, or Deardorff during their employment with Cornerstone, and such documents must be immediately returned to Plaintiff Cornerstone;

---

1. Each held the following positions within Cornerstone: Brohm was president and CEO; Ryan was vice president of business development; McGee was vice president of hospital relations; Huggler was vice president of finance; and Deardorff was the group CFO.

2. Appellants' briefs refer to Reliant Hospital Partners, LLC as "Old Reliant" and after a later acquisition by appellant Nautic as "New Reliant." For purposes of appeal, we need not make a distinction between these two and simply make reference to "Reliant."

(2) using or disclosing Plaintiff Cornerstone's confidential and/or proprietary information, including, but not limited to, marketing materials and strategic planning information developed by any of Defendants Brohm, Ryan, McGee, Huggler, or Deardorff during their respective periods of employment with Cornerstone; and

(3) engaging in, or attempting to engage in, the development, acquisition, merger, partnership, or joint or shared service with any post-acute care facility, information about which was presented or disclosed to Defendants Brohm, Ryan, McGee, Huggler, or Deardorff while employed at Cornerstone (see Exhibit A).

With regards to Beakey and Crouch, the temporary injunction prohibited the following:

(1) retaining any electronic documents, originals, or hard copies of materials, property, documents, data and any other information obtained by any of Defendants Brohm, Ryan, McGee, Huggler, or Deardorff during their employment with Cornerstone, and such documents must be immediately returned to Plaintiff Cornerstone; and

(2) using or disclosing Plaintiff Cornerstone's confidential and/or proprietary information, including, but not limited to, marketing materials and strategic planning information developed by any of Defendants Brohm, Ryan, McGee, Huggler, or Deardorff during their respective periods of employment with Cornerstone.

Huggler was prohibited from the following:

(1) retaining any electronic documents, originals, or hard copies of materials, property, documents, data and any other information obtained by any of Defendants Brohm, Ryan, McGee, Huggler, or Deardorff during their employment with Cornerstone, and such documents must be immediately returned to Plaintiff Cornerstone.

Deardorff was prohibited from the following:

(1) retaining any electronic documents, originals, or hard copies of materials, property, documents, data and any other information obtained by any of Defendants Brohm, Ryan, McGee, Huggler, or Deardorff during their employment with Cornerstone, and such documents must be immediately returned to Plaintiff Cornerstone; and

(2) using or disclosing Plaintiff Cornerstone's proprietary software.

And finally, the temporary injunction prohibited Moore from the following conduct:

(1) retaining any electronic documents, originals, or hard copies of materials, property, documents, data and any other information obtained by any of Defendants Brohm, Ryan, McGee, Huggler, or Deardorff during their employment with Cornerstone, and such documents must be immediately returned to Plaintiff Cornerstone, if any; and

(2) using or disclosing Plaintiff Cornerstone's confidential information, limited to marketing materials and strategic planning information developed by Defendants Brohm, Ryan, or McGee during their respective periods of employment with Cornerstone.

Appellants filed accelerated notices of appeal. Brohm, Crouch, Reliant, Nautic, Hilinski, and Beakey generally argue (1) the trial court erred by granting the temporary injunction because Cornerstone failed to show a probable right to relief on any of its claims; (2) Cornerstone failed to show irreparable harm, and the trial court entered an overbroad order that prohibits competition rather than use of allegedly confidential information; and (3) the court

failed to address the balance of equities and public interest, neither of which support an injunction.

Moore, whose only involvement in the whole transaction stems from being owner of Reliant and agreeing to sell it to Nautic, generally argues the trial court erred in entering a temporary injunction against him because there is no evidence supporting such a claim, and there is no evidence Cornerstone will sustain probable, imminent, and irreparable injury because of him.

### Standard of Review and Applicable Law

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id.* To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.* An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Id.*

In relevant part, rule of civil procedure 683 requires every order granting a temporary injunction to state the reasons for its issuance, be specific in terms, and describe with reasonable detail and not by reference to the complaint or other document, the acts sought to be restrained. TEX.R. CIV. P. 683; *El Tacaso, Inc. v. Jireh Star, Inc.*, 356 S.W.3d 740, 744 (Tex.App.-Dallas 2011, no pet.). "[T]he obvious purpose of [rule 683] is to adequately inform a party of what he is enjoined from doing

and the reason why he is so enjoined." *Id.* (quoting *Schulz v. Schulz*, 478 S.W.2d 239, 244–45 (Tex.Civ.App.-Dallas 1972, no writ)).

The trial court's order stating its reasons for a temporary injunction must be specific and legally sufficient on its face and not merely conclusory. TEX.R. CIV. P. 683 (stating order "shall be specific in its terms"). To comply with rule 683, a trial court must set out in the order the reasons the court deems it proper to issue the injunction, including the reasons why the applicant will suffer injury if the injunctive relief is not ordered. *El Tacaso, Inc.*, 356 S.W.3d at 744.

The requirements of rule 683 are mandatory and must be strictly followed. *Id.* Even if a sound reason for granting relief appears elsewhere in the record, the Texas Supreme Court has stated in the strongest terms the rule must be followed. *State v. Cook United, Inc.*, 464 S.W.2d 105, 107 (Tex.1971) (Calvert, J., concurring) ("The requirement of Rule 683 that the reasons for issuing an injunction be stated in the order could hardly be couched in stronger language. It is mandatory."). If a temporary injunction fails to meet these requirements, it is void. *El Tacaso, Inc.*, 356 S.W.3d at 744.

The decision to grant or deny a temporary injunction is within the trial court's sound discretion and that discretion can be reversed on appeal only if we are convinced that it represents a clear abuse of discretion. *Amend v. Watson*, 333 S.W.3d 625, 627 (Tex.App.-Dallas 2009, no pet.). When we review a trial court's order on an application for temporary injunction, we cannot substitute our judgment for that of the trial court, even if we would have reached a different conclusion. *Id.* Instead, we review the evidence in the light most favorable to the trial court's

order, indulging every reasonable inference in its favor, and determine whether the order is so arbitrary that it exceeds the bounds of reasonable discretion. *Id.* A trial court does not abuse its discretion by denying an application for temporary injunction if the applicant failed to prove one of the requirements for a temporary injunction. *Id.*

### Discussion

#### A. *Appellant Moore*

■ We begin our discussion by addressing Moore's arguments. He contends (1) the order is void because the trial court did not follow the mandatory requirements for rule 683; (2) there is no evidence supporting one or more of the essential elements of each claim against him; (3) there is no evidence Cornerstone will sustain probable, imminent, and irreparable injury caused by him; and (4) the court ignored Cornerstone's burden of proof to obtain a temporary injunction against him because the scope of relief sought was relatively minor. Because issue one is dispositive, we shall address it first.

The temporary injunction defines "Old Reliant" to include "Defendant Addison Resolution, LLC" and "Defendant Emmett Moore." The injunction purports to order Moore not to retain, use or disclose certain unidentified, confidential information related to Cornerstone. However, the trial court made no findings that Moore possessed any of Cornerstone's confidential information or that he had ever seen any confidential information. In fact, the trial court struck through the following fact-findings included by Cornerstone in it proposed order:

- "In November 2010, the Nautic Defendants and ~~Old Reliant Defendants approached Defendant Brohm~~ and Began to Plan Creation of 'New' Reliant." [3]

- "The Court finds that the strategic information regarding the facilities identified in Exhibit A was disclosed to the Nautic Defendants, the Reliant Defendants, and the ~~Old Reliant~~ Defendants as part of the conspiracy between the parties to misappropriate Cornerstone's trade secrets or confidential information and usurp Cornerstone's corporate opportunity." [4]

- "The ~~Old Reliant Defendants,~~ Reliant Defendants, and Defendants Brohm, Ryan, McGee, Huggler, and Deardorff Intentionally Deleted E–Mail an Documents to Cover Up Their Actions." [5]

- "The Nautic Defendants, the Reliant Defendants, ~~the Old Reliant Defendants,~~ and Defendants Brohm, Ryan, McGee, Huggler, and Deardorff Have Each Engaged in Unlawful Conduct." [6]

---

3. The amended order states "In November 2010, Defendant Brohm approached the Nautic Defendants and Began to Plan Creation of "New" "Reliant."

4. The amended order states "The Court finds that the strategic information regarding the facilities identified in Exhibit A was disclosed to the Nautic Defendants, the Reliant Defendants (except for Deardorff and Huggler), and the Defendants as part of the conspiracy between the parties to misappropriate Cornerstone's trade secrets or confidential information and usurp Cornerstone's corporate opportunity."

5. The amended order states "The Reliant Defendants and Defendants Brohm, Ryan, McGee, Huggler, and Deardorff Intentionally Deleted E-mail and Documents to Cover Up Their Actions."

6. The amended order states "The Nautic Defendants, the Reliant Defendants, and Defendants Brohm, Ryan, McGee, Huggler, and Deardorff Have Each Engaged in Unlawful Conduct."

- "Defendants Brohm, Ryan, McGee, ~~Huggler, and Deardorff~~ misappropriated Cornerstone's business processes, financial data, and acquisition target list by providing it to the Nautic Defendants, Reliant Defendants, and ~~the Old Reliant Defendants~~ ... The ~~Old Reliant Defendants~~ and Nautic Defendants used the information for their own business purpose...." [7]

After removing these proposed findings, the temporary injunction fails to make mention of Moore anywhere except under section III, titled "PROHIBITED CONDUCT BY THE DEFENDANTS."

While the trial court's temporary injunction order sets out examples of actions to be restrained, the order provides no nexus between the actions restrained and an irreparable injury to Cornerstone that cannot be adequately compensated. *See* TEX.R. CIV. P. 683. Specifically, the court's order does not explain the probable, imminent, and irreparable harm Cornerstone will suffer absent an injunction against Moore. *See, e.g., El Tacaso, Inc.,* 356 S.W.3d at 744 (purpose of rule 683 is to adequately inform a party of what he is enjoined from doing and the reason why he is enjoined). And as noted above, the trial court specifically struck through any proposed findings by Cornerstone. The court's order includes such findings against other appellants, but is completely silent as to any findings against Moore.

Accordingly, we cannot conclude the temporary injunction meets the mandatory specificity requirements of rule 683. TEX.R. CIV. P. 683. Thus, we have no choice in our disposition of this matter. The temporary injunction order is void as to Moore. *See, e.g., El Tacaso, Inc.,* 356

S.W.3d at 748. We sustain Moore's first issue. Having reached this conclusion, we need not address Moore's remaining issues.

The trial court's order granting temporary injunctive relief as to Moore is reversed. Accordingly, we dissolve the temporary injunction against him.

### B. Cornerstone's Spoliation Argument

▮▮▮▮▮ Before addressing the remaining appellants' arguments, we will address Cornerstone's contention that this appeal is easily disposed of because of the spoliation doctrine. "The doctrine of spoliation refers to the improper destruction of evidence relevant to a case." *Buckeye Retirement Co., LLC v. Bank of America, N.A.,* 239 S.W.3d 394, 401 (Tex.App.-Dallas 2007, no pet.). The intentional destruction or spoliation of relevant evidence may, in the trial court's discretion, give rise to a presumption that the destroyed evidence would not have been favorable to its destroyer. *Id.* The presumption may be rebutted by a showing that the evidence in question was not destroyed with a fraudulent purpose or intent. *Id.* Trial courts have broad discretion to take measures to correct the ill effects resulting from spoliation, including a jury instruction on the spoliation presumption and death penalty sanctions. *Id.*

Cornerstone argues the evidence reveals that Brohm told his assistant and Deardorff to copy files from Cornerstone's computers onto a thumb driver that could be taken with them to Reliant. The information was then copied onto Reliant laptop computers. Brohm later instructed them to delete documents from their Cornerstone computers. Others also deleted po-

---

7. The amended order states "Defendants Brohm, Ryan, and McGee misappropriated Cornerstone's business processes, financial data, and acquisition target list by providing it

to the Nautic Defendants and Reliant Defendants.... The Nautic Defendants used the information for their own business purpose...."

tentially relevant email and data from both their Cornerstone and Reliant computers. Based on this destruction of evidence, Cornerstone argues the trial court "does not abuse its discretion by issuing a temporary injunction when spoliation by several Defendants supplies a presumption of prima facie evidence against them."

■■■ Cornerstone has not cited to any case in which a trial court has applied the spoliation doctrine to support a temporary injunction, and we have found none. Under the facts of this case, we decline Cornerstone's invitation to apply the spoliation doctrine to support the injunction.

The appellants argue Cornerstone repeatedly encouraged the trial court to apply a spoliation presumption, but the court refused. We agree. During a hearing, the trial court specifically stated, "I'm not going to rule on the spoliation issue today no matter what we do." During earlier discussions, the trial court stated it understood Cornerstone's frustration and admitted some of the information seemed "very suspect," but explained "I don't want to rush in-partly because spoliation instructions [are] not something I have to decide right now anyway. I mean, that's really for trial."

The trial court made no specifics findings in the temporary injunction regarding spoliation. We acknowledge that the order states the following:

> With varying degrees of success, the Defendants have attempted to hide the evidence of their conspiracy from Cornerstone (before the lawsuit was filed but after they anticipated litigation) and the Court (since the lawsuit was filed) by using personal E-mail addresses to communicate with each other, deleting E-mail and other documents on their personal and work E-mail accounts, and instructing others to delete E-mail and other documents from their personal

and work E-mail accounts. To the extent the Defendants have provided testimony and evidence contrary to these findings, the Court finds that it is *not credible.*

[Emphasis added.] While Cornerstone tries to construe this "not credible" finding as a spoliation finding, we do not agree with this interpretation. Determining that evidence is not credible is not analogous to a determination by the court that (1) there was a duty to preserve evidence, (2) the alleged spoliator negligently or intentionally spoliated the evidence, and (3) that the spoliation prejudiced the nonspoliator's ability to present its case. *See Buckeye Retirement Co., LLC,* 239 S.W.3d at 401 (discussing factors a trial court considers when determining whether to apply a spoliation presumption). Accordingly, we are not persuaded by Cornerstone's spoliation argument and will now address the remaining appellants' arguments.

## C. Trial Court's Determination of Trade Secret Protection

In its first three issues, the remaining appellants argue the trial court erred by treating publicly available information as "secret," by entering a temporary injunction prohibiting the use or disclosure of trade secrets or confidential information without identifying said information in the order, and by entering a temporary injunction without requiring Cornerstone to show use or imminent use of the alleged trade secret.

■■■ We first note the fact that a temporary injunction order granting trade secret protection does not mean the protected information is in fact a trade secret. That issue will be decided upon the trial on the merits. *See Sharma v. Vinmar Intern., Ltd.,* 231 S.W.3d 405, 424 (Tex.App.-Houston [14th Dist.] 2007, no pet.).

A trade secret is any formula, pattern, device, or compilation of information that is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. *In re Bass*, 113 S.W.3d 735, 739 (Tex.2003). Customer lists, pricing information, client information, customer preferences, buyer contacts, blueprints, market strategies, and drawings have all been recognized as trade secrets. *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd).

"Secret" implies the information is not generally known or readily available; however, "the mere fact that knowledge of a product or process may be acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means." *Sharma*, 231 S.W.3d at 424; *see also Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993, no writ). The question is not "How could he have secured the knowledge?" but "How did he?" *Id.*

A person is liable for disclosure of a trade secret if he either (1) discovers the secret through improper means or (2) his disclosure and use, after properly acquiring knowledge of the secret, constitutes a breach of the confidence reposed to him. *Id.* (citing *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 778 (1958)).

Upon the formation of an employment relationship, certain duties arise apart from any written contract. *Id.* One of those duties forbids an employee from using trade secret information acquired during the employment relationship in a manner adverse to the employer, and this obligation survives the termination of employment. *Id.* While this obligation does not bar the former employee from using the general knowledge, skill, and experience acquired during employment, it does prevent him from utilizing trade secrets acquired during the employment relationship. *Id.*

In determining whether information constitutes a trade secret, a court considers the following six factors:

(1) the extent to which the information is known outside the claimant's business;

(2) the extent to which the information is known by employees and others involved in the claimant's business;

(3) the extent of the measures taken by the claimant to guard the secrecy of the information;

(4) the value of the information to the claimant and to its competitors;

(5) the amount of effort or money expended by the claimant in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d at 739. The party claiming a trade secret need not satisfy all six factors because trade secrets do not fit neatly into each factor every time. *Id.* at 740.

Appellants argue the trial court erred by providing trade secret protection to information that did not meet the proper standard including CEO market summaries that included such information as (1) a hospital's reputation, (2) a physician having a private family practice, and (3) hospitals that were merely identified as potential acquisition targets for Cornerstone. Appellants state a "review of the July 1, 2011 hearing transcript readily shows that the trial court improperly treated as protected trade secrets a host of material that, as a matter of law, cannot merit such protection." Because the record in this

appeal is voluminous, we limit our review to this hearing as cited by appellants and to the specific citations to other record references by the parties. *See Most Worshipful Prince Hall Grand Lodge, Free and Accepted Masons of Tex. & Jurisdiction v. Jackson,* 732 S.W.2d 407, 412 (Tex. App.-Dallas 1987, writ ref'd n.r.e.) (noting it is not the court of appeals' duty to make an independent search of the record for evidence supporting a litigant's position under a particular point of error); *see also King v. Wells Fargo, N.A.,* 205 S.W.3d 731, 735 (Tex.App.-Dallas 2006, no pet.).

When reviewed in the light most favorable to the trial court's order, as we must, the evidence supports the trial court's determination that Cornerstone possessed trade secrets. The former CEO of Old Reliant, Emmett Moore, testified in a separate hearing that market statistics, financial information, structure and ownership, and bed need analysis would be considered confidential. He explained a bed need analysis determines how many beds in a market are needed based on the existing amount of demand for rehab beds and how many there are. He explained the process for conducting this analysis and said the ultimate information generated would be considered confidential information.

Christopher Corey, a principal with Nautic, testified in a deposition that referral sources may be considered confidential, and he agreed Reliant considers its target acquisition list to be confidential.

Patrick Daugherty, the chairman of the board for Cornerstone, testified Brohm reached out to the CEOs at facilities in Cornerstone's market and asked for information about potential target opportunities in their markets. Daugherty explained that Cornerstone put a lot of time, effort, and money into developing the infrastructure and relationships necessary to gather the compiled information and present it the management team. If competitors received the list, Cornerstone would be "completely" at a competitive disadvantage "because this was our target list, what made sense for us, how far, how many beds . . . this was our strategic work product and how we were going to grow our platform, which was best for us, but I also think it conveys our vulnerabilities." He further testified he would not want "my people" making recommendations to competitors about how to compete with Cornerstone.

However, this is exactly what Brohm did. Once he gathered the information for IRF targets, he shared the information with Reliant, not with Cornerstone. Daugherty confirmed that Brohm sent a "business plan" to Reliant, from his Cornerstone email address, that contained Cornerstone's confidential information. Daugherty stated, "It was our complete playbook for how we were going to attack the market opportunities."

Exhibit 266, referred to as the CEO market summaries discussed above and the main focus of the July 1, 2011 hearing, is a compilation of Cornerstone's claimed trade secrets. It is "a compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass,* 113 S.W.3d at 739. While appellants repeatedly argue such information was readily available through the internet or by exerting minimal effort to talk with others within the industry, the mere fact that knowledge of a process or product may be acquired through inspection or analysis, "does not preclude protection from those who would secure that knowledge by unfair means." *Sharma,* 231 S.W.3d at 424. As previously stated, the question is not "How could he have

secured the knowledge?" but "How did he?" *Id.*

The record supports Cornerstone's claim Brohm secured the knowledge by using his contacts while at Cornerstone to gather the information and then shared the information with others while still employed at Cornerstone. The trial court did not abuse its discretion in determining such information was entitled to trade secret protection pending resolution of the case. It heard evidence regarding three of the six *In re Bass* factors listed above: (1) the value of the information to Cornerstone and its competitors; (2) the time and effort expended by Cornerstone in developing the market summaries; and (3) the ease or difficulty in acquiring the information. *In re Bass*, 113 S.W.3d at 739.

This evidence supports the trial court's findings that "the facilities identified in Exhibit A (which is incorporated here for all purposes) were disclosed to Defendants Brohm, Ryan, and McGee during their employment at Cornerstone as prospective targets for business development" and such strategic information was disclosed to "the Nautic Defendants, the Reliant Defendants (except Deardorff and Huggler) and the Defendants." Despite appellants' arguments to the contrary, the trial court was not required to make further specific findings identifying the trade secrets or confidential information. *See Rugen*, 864 S.W.2d at 553 ("When confidential information and trade secrets are sought to be protected, courts should word the injunction order to avoid disclosure of the information.").

Accordingly, we conclude Cornerstone has pleaded a cause of action that it possessed trade secrets the appellants wrongfully acquired. Should the appellants use such trade secrets to compete with Cornerstone, Cornerstone would have a probable right to the relief it seeks against appellants. Cornerstone further presented evidence that if appellants were allowed to use the specific information contained in exhibit 266, and attached as Exhibit A in the temporary injunction order, they would have a competitive advantage over Cornerstone in acquiring the target hospitals. Such an advantage would probably damage Cornerstone during the pendency of these proceedings and such damages could not be adequately compensated by a money judgment. *See Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968) (granting of temporary injunction is appropriate when a party pleads a cause of action, shows a probable right on final trial to the relief sought, and probable injury in the interim); *see also See Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 737–38 (Tex.App.-Dallas 2010, no pet.) (party is entitled to recover for misappropriation of trade secrets by establishing the existence of a trade secret, breach of a confidential relationship, use of the trade secret without authorization, and resulting damages).

█ Thus, we cannot say the trial court's granting of the temporary injunction prohibiting the use of the data compiled in exhibit 266 was a clear abuse of discretion. Having reached this conclusion, we need not address appellants' arguments that Cornerstone failed to show a probable right to relief on its claims for usurpation of corporate opportunities and conspiracy because Cornerstone need not show a probable right to relief and probable injury on every one of its claims. Establishing the right to recover on one is sufficient to justify preserving the status quo. *See, e.g., Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 481 (Tex.App.-Dallas 2010, no pet.) (holding that where a probable right to recovery had been shown as to one loan, the party did not have to show probable right to relief as to all to pre-

serve status quo). Accordingly, we overrule appellants' first issue.

### D. Trial Court's Prohibition of All Competition Rather than Limiting Use of Confidential Information

■ Appellants Reliant, Nautic, Hilinski, Brohm, McGee, and Ryan further complain the trial court erred by entering an order that is overbroad and enjoins them from pursuing any future acquisitions or other business opportunities regardless of whether or not they use any alleged confidential information. They argue the trial court entered an order prohibiting all competition. They specifically complain about the following prohibited conduct:

> (3) engaging in, or attempting to engage in, the development, acquisition, merger, partnership, or joint or shared service with any post-acute care facility, information about which was presented or disclosed to Defendants Brohm, Ryan, McGee, Huggler, or Deardorff while employed at Cornerstone (see Exhibit A).

We agree such language is overbroad.

■ The improper use of trade secrets provides a proper basis for an injunction; however, every order granting an injunction must be specific in its terms and describe in reasonable detail the act or acts to be restrained. *Sw. Research Inst. v. Keraplast Tech., Ltd.,* 103 S.W.3d 478, 482 (Tex.App.-San Antonio 2003, no pet.); *see also* Tex.R. Civ. P. 683. In a case involving trade secrets or confidential information, the injunction must be narrowly tailored to address the improper use of confidential or proprietary information. *Id.* Further, the injunction must not be framed so broadly as to prohibit the enjoyment of lawful rights. *Id.*

Here, we agree with appellants that the above language does not focus on protecting any specific information. Rather, the broad language bars certain appellants from trying to develop or pursue *any* acquisitions or other opportunities, rather than only those opportunities appellants learned about through confidential information while employed at Cornerstone. Thus, the court essentially created a noncompete restriction. *See, e.g., T–N–T Motorsports, Inc.,* 965 S.W.2d at 25 (narrowing temporary injunction because it did not enjoin appellants from using or disclosing only trade secrets or confidential information). While we acknowledge that the trial court included "(see Exhibit A)," this notation alone, without further explanation, does not restrict appellants from contacting only those facilities on the list. Thus, this notation does nothing to alleviate the overbroad language within the paragraph.

Cornerstone argues the order does not bar appellants "from buying any healthcare facilities **except** those they targeted with the help of Cornerstone's confidential information." (Emphasis in original.) We disagree with Cornerstone's interpretation. Nothing within the language of paragraph (3) limits appellants to targeting only those facilities they learned about through confidential information. Rather, it prevents them from contacting or pursuing any opportunity based on information presented or disclosed to Brohm, Ryan, McGee, Huggler, or Deardorff while employed at Cornerstone. Nowhere within paragraph (3) is there a limitation to confidential information.

Likewise, we are not persuaded by Cornerstone's reliance on *Rugen.* In that case, the trial court rendered a temporary injunction against Rugen, a former employee, that enjoined her from "calling on, soliciting, or transacting business with consultants employed or retained by IBS until final judgment." 844 S.W.2d at 550. On appeal, this court concluded the temporary injunction did not prevent Rugen from all

competition with IBS, but rather prohibited her from soliciting or transacting business with IBS's consultants and customers whose identities she was able to obtain through confidential information. *Id.* at 551. The injunction did not prevent Rugen from organizing a competing firm and developing her own client list and consultants. *Id.*

As previously stated, the wording of the paragraph at issue here does in fact prevent appellants Reliant, Nautic, Hilinski, Brohm, McGee, and Ryan from contacting any facility regardless of whether they learned about the facility through confidential information. Such wording is overbroad for purposes of rule 683. *See* TEX.R. CIV. P. 683. Thus, we sustain appellants' second issue, modify the order, and delete paragraph (3) of the temporary injunction as to appellants Reliant, Nautic, Hilinski, Brohm, McGee, and Ryan.

*E.   Trial Court's Failure to Address the Balance of Equities and Public Interest*

In its final issue, appellants argue the trial court erred by failing to address the balance of harms and the public interest, neither of which supports the injunction. Cornerstone responds there is no such requirement under rule 683 or anywhere else.

While rule 683 does not specifically require a balancing of equities and public interest, numerous courts have considering them when deciding if a trial court properly granted or denied an injunction. We agree with appellants that there is no specific mention in the order that the trial court balanced the equities. However under the present facts, the question was raised by the pleadings, evidence was heard, and there is an implied finding that the trial court balanced the equities in favor of Cornerstone by granting the tem-

porary injunction. *See, e.g., Estancias Dallas Corp. v. Schultz,* 500 S.W.2d 217, 221 (Tex.App.-Beaumont 1973, writ ref'd n.r.e.). Accordingly, appellants' final issue is overruled.

## Conclusion

We reverse and render as to appellant Moore and dissolve the temporary injunction against him. Having sustained appellants' second issue, we modify the order of the trial court granting a temporary injunction against appellants Reliant, Nautic, Hilinski, Brohm, McGee, and Ryan, and affirm the order as modified.